MAXWELL, J.,
for the Court:
¶ 1. Deanna Wilbourn and her son Richard Wilbourn III were co-trustees of a testamentary trust created by the late Richard Wilbourn II. In his will, Richard II, the largest shareholder of Citizens National Bank of Meridian (Bank), left his Bank shares to the trust. Deanna is the sole income beneficiary, while Richard III and his sisters, Elizabeth Williamson and Garnett Hutton, are to receive the principle when Deanna dies.
¶ 2. Believing Richard III was not acting in their best interest, Deanna, Elizabeth, and Garnett attempted under the terms of the trust to remove Richard III as co-trustee. Richard III sued them, arguing his removal was ineffective, and urged the chancery court remove Deanna instead. Deanna, Elizabeth, and Garnett counterclaimed, asking the chancery court to remove Richard III if their written notice of removal had not effectively removed him.
¶ 3. Over a nineteen-day trial, the chancellor heard testimony about Richard Ill’s secret tape recordings of conversations with Deanna, his protection of his seat on the Bank board at the expense of his family’s majority voice in board elections, his fractious relationship with the Bank’s chief executive officer, and his attempts to have Deanna declared incompetent while at the same time steering her to make significant financial decisions that would benefit Richard III. The chancellor concluded there were multiple justifications for judicially removing Richard III as co-trustee, while no cause existed to remove Deanna.
¶ 4. On appeal, Richard III argues the chancellor’s fact findings demonstrate bias and were based on irrelevant and inadmissible evidence and an erroneous application of trust law. Our review reveals no error. Thus, we affirm the chancery court’s judgment.
FACTS AND PROCEDURAL HISTORY
¶ 5. Richard II was a successful attorney and businessman. During his life he amassed a substantial amount of property, mostly shares in Citizens National Bank. He left a detailed will. But despite his efforts to provide for the management of his interest in the Bank after he was gone, less than four years of his death, his imme *364 diate family had sued each other over the control of the trust he created.
I. Bank and Holding Company
¶ 6. At the end of Richard II’s life, he along with his wife and children were the largest shareholders of Citizens National Bank. As Richard II built his influence over the Bank, he often butted heads with the Bank’s chief executive officer, Archie McDonnell Sr. But in 1999, Richard II and Archie Sr.’s son, Archie McDonnell Jr., came together to create a strategic plan for the Bank. Under this plan, Richard II became chairman of the board and Archie Jr. president and CEO of the Bank. This led to a prosperous time for the Bank, with Archie Jr. managing the day-to-day operations and Richard II controlling the board.
¶ 7. Also in 1999, Richard II brought his son Richard III onto the board — but not without limitations. The two executed a “memorandum of agreement.” If Richard II believed Richard Ill’s services were “no longer advantageous to the Wilbourn’s family overall interest,” then Richard III would resign and not run for re-election during his father’s lifetime. Richard III also agreed that, upon Richard II’s death or resignation, he would nominate a Wilb-ourn family member to replace Richard II on the board, in order to protect the family’s significant financial interest in the Bank. The agreement also detailed how Richard II had gained his interest in the Bank and how he had arranged for his children to obtain individual interests as well.
¶ 8. In 2003, as a mechanism to raise capital, the Bank formed a holding company, Citizens National Bank Corp. All the Bank stock was exchanged for holding company stock. Bank shareholders became holding company shareholders, and the holding company became the sole shareholder of the Bank. Richard II became a 30% owner of the holding company. His shares combined with the shares of his immediate family gave the Wilbourns 52% ownership and majority control. The McDonnell’s owned 16.5%. Another 10% was owned by Richard II’s siblings, with the rest owned by neither Wilbourns nor McDonnells.
¶ 9. The holding company board selects the Bank board, which actually governs the Bank’s operations. The only other role of the holding company is to determine dividends. When Richard II died unexpectedly in October 2004, the holding company’s board of directors had five members: Richard II (who was chairman), Richard III, Archie Sr., Archie Jr., and Garnett. At the time, there had been no plans about who would replace Richard II as chairman of both the holding company and Bank boards. With some reluctance, Deanna, Elizabeth, and Garnett supported Archie Jr.’s nomination of Richard III for both positions. In November 2004, Richard III replaced his father as chairman of the Bank board and Elizabeth replaced her father as Bank director. And the next month, Richard III replaced his father as chairman of the holding company board, and Deanna replaced her husband as director.
II. Marital Trust B
¶ 10. In his will, Richard II left all his Bank shares to Richard III and Deanna to hold in trust for the use and benefit of Deanna. Because the holding company had been formed after the execution of the will, the Lauderdale Chancery Court granted Richard III and Deanna’s petition to place Richard II’s 41,910 shares of holding company stock in the testamentary trust (Marital Trust B, or Trust) to fulfill the purposes of the will. The 41,910 holding company shares are the only assets of Marital Trust B.
*365 ¶ 11. Under the terms of Marital Trust B, the co-trustees are to distribute annually all the net income to Deanna. They are also prohibited from “appointing] any part of the property constituting the trust to any person other than [Deanna] during her lifetime.” At Deanna’s death, the property is to be equally divided between Richard III, Elizabeth, and Garnett.
¶ 12. Richard II expressed within the terms of the Trust his intention regarding his family’s ownership and control, of the Bank:
I am committed during my lifetime to voting against any mergers of the bank that would dilute my interest and to opposing the sale of the stock to another bank, bank holding company or individual. ' I believe that I have acquired enough stock to be able to unilaterally prevent this. Having expressed these thoughts and desires, ... neither the Co-Trustees nor the proxy of the trust shall sell this stock or vote in favor of any merger or other corporate action which is calculated to lead to a merger which would dilute the voting power or ownership of the stock in The Citizens National Bank of Meridian or would lead to the sale or exchange of this stock without the unanimous consent in writing of all the beneficiaries of the income and the principal of this trust.
Richard II also provided for trustee removal:
If Richard E. Wilbourn, III or Deanna A. Wilbourn shall be or become for any reason unable or unwilling to serve as Co-Trustee of this trust, I hereby appoint Elizabeth W. Williamson as Successor Co-Trustee, to serve as if originally appointed. In the event that Elizabeth W. Williamson shall be or become for any reason unable or unwilling to serve as Trustee of this trust, I hereby appoint Garnett W. Hutton as Successor Co-Trustee, to serve as if originally appointed. Notwithstanding the foregoing, and if and only if a Co-Trustee shall become incompetent, unable to serve or grossly mismanages the trust, my wife and children, other than the child serving as Co-Trustee, acting unanimously, shall have the power to remove any Co-Trustee or Successor Co-Trustee and to appoint a Successor Trustee or Co-Trustee, such action to be accomplished by the execution and acknowledgment of a written instrument to that affect, and delivery of that instrument to all Co-Trustees.
¶ IB. In both March 2005 and March 2006, Richard III and Deanna, as co-trustees of the 41,190 holding company shares, agreed how to vote the stock in the election of holding company board members. But they were not able to agree how to vote the stock in March 2007. As a result, the shares were not voted.
III. Family Dispute
¶ 14. The voting impasse grew out of a conflict that began brewing in 2006 and eventually led to this lawsuit. From the time Richard III became chairman of the Bank board, his relationship with CEO Archie Jr. was not as cooperative as his father’s. The chancery court found Richard Ill’s actions upset the board-management balance between the Wilbourns and the McDonnells. Several Bank employees testified about what they perceived to be Richard Ill’s interference with Archie Jr.’s daily bank management and the negative effect Richard Ill’s mistrust of Archie Jr. had on employee morale. A consultant hired by the Bank testified Richard III had voluntarily spoken of his mistrust of Archie Jr., calling Archie Jr. a “silver-tongue devil.”
¶ 15. After an unsuccessful conversation with Richard III, Archie Jr. took his *366 concerns to Deanna. Elizabeth testified she had interviewed Bank officers, who verified what Archie Jr. had said. In February 2006, Deanna, Elizabeth, and Garnett spoke to Richard III about the complaints and expressed their support of Archie Jr. Richard III wrote his family an apologetic letter, and for several months the looming crisis appeared to have abated. But in October 2006, Archie Jr. approached Deanna with the same concerns.
¶ 16. On October 24, 2006, Deanna met with Richard III and told him she feared Richard Ill’s actions were damaging the family’s relationship with the Bank and its employees. She also expressed concern about Richard Ill’s dealings in other family matters, questioning whether he was acting in the family’s best interest. She gave Richard III an ultimatum — cooperate with Archie Jr. or resign from both boards.
¶ 17. On January 1, 2007, Deanna learned Richard III had been secretly tape recording their conversations. In some conversations, Richard III can be heard making asides about Deanna’s behavior, as if building a case against her. Richard Ill’s first responded by telling his mother she should assume she is being recorded. But later he sent a written apology promising not to record any more conversations — a promise he did not keep. Deanna testified this discovery severely damaged her ability to trust Richard III, who was not only her son and co-trustee of the Trust that provided her annual income but also had been acting as her lawyer.
¶ 18. The chancellor’s findings of fact went into detail about the various ways in which Richard III had legally represented Deanna — advising her on buying a condominium in Florida and on a potential lawsuit connected with Katrina damage; becoming a partner in the law firm that had represented Deanna for decades; and working with an estate-planning attorney to create a trust, the Providence Trust, that would own life insurance to pay estate taxes upon Deanna’s death.
¶ 19. Richard III was the irrevocable family trustee of the Providence Trust. He appointed a non-family member, Kirk Reasonover, as co-trustee. The Providence Trust never bought life insurance, but Deanna did place her personal shares of the holding company in the trust. At the time the conflict with her son emerged, Richard III had been inquiring about transferring the Marital Trust B shares to the Providence Trust, despite the fact Richard II had not authorized the transfer of Marital Trust B property to anyone other than Deanna. Richard III proposed that Deanna sell the holding company stock to the Providence Trust. In exchange Deanna would receive interest on a promissory note guaranteed by her children, instead of the annual dividends from the Marital Trust B property as Richard II had directed. Deanna never went through with the proposal. Richard III acknowledged the proposal violated the terms of Marital Trust B, but testified at the time his family thought the proposal was a good way to avoid tax consequences at Deanna’s death. If Deanna had gone through with Richard Ill’s plan, he and Reasonover, as co-trustees, would have controlled how both the Marital Trust B and Deanna’s holding company shares were voted — without any other family input.
¶ 20. On January 9, 2007, Deanna, Gar-nett, Archie Sr., and Archie Jr. — four of the five members of the holding company — voted to remove Richard III as chairman of the holding company board, chairman of the Bank board, and member of the Bank’s board. At this same meeting, the holding company board nominated a slate of directors to be elected by the *367 shareholders in March 2007. On this slate were Archie Sr., Archie Jr., Deanna, Gar-nett, and Elizabeth’s husband, Russell Williamson.
¶ 21. On January 30, 2007, Richard III sent Archie Jr. and Deanna a letter, in which he proposed to settle the dispute between himself and the holding company board. As part of his proposal: “The shares of Trust B will not be voted in March 2007. I have been promised the support of [my uncle’s] family. With that I will be elected to the Holding Company Board.” Archie and Deanna offered to revise the slate, nominating Richard III instead of Garnett, so that the Marital Trust B shares could be voted. Richard III declined. Over the next month, both Richard III and Deanna made unsuccessful attempts to resolve how the shares would be voted. In March, the day of the vote, Deanna asked Richard III to agree to a ballot that included Archie Sr., Archie Jr., Williamson, Deanna, and Richard III. When Richard III refused, Deanna asked whom he wanted nominated. Richard III suggested Reasonover and another non-family member.
¶ 22. Deanna submitted the ballot, which was not counted because it did not contain both trustees’ signatures. Richard III was reelected to the holding company board by his and his uncle’s votes. Williamson and Deanna were elected through Elizabeth and Garnett’s votes and non-family shareholders. Archie Sr. and Archie Jr. were also elected.
¶ 23. In April 2007, Deanna, Elizabeth, and Garnett executed a written notice of removal of Richard III as co-trustee of Marital Trust B. The notice charged Richard III with “incompetence” based on his use the his voting power of the Marital Trust B shares for his own benefit.
IV. Lawsuit
¶ 24. On May 17, 2007, Richard III sued Deanna, Elizabeth, and Garnett. His complaint requested: (1) a declaratory judgment that the April 2007 notice of removal is void, (2) the removal of Deanna as co-trustee based on her incompetence and/or gross mismanagement of the trust and that she be replaced by “independent” co-trustee (i.e., not Elizabeth or Garnett), (3) a full accounting of the trust, and (4) unpaid trustee fees. The first claim was resolved prior to trial. The chancellor granted summary judgment in Richard Ill’s favor on his claim that the April 2007 written notice of removal did not in fact remove him as co-trustee. Deanna, Elizabeth, and Garnett counter-claimed, asking the chancery court to exercise its common-law authority to remove Richard III as co-trustee.
¶ 25. Trial began on December 15, 2008. Richard III presented his case-in-chief over eighteen days spread throughout December 2008, May 2009, and August 2009. At the end of his presentation of the evidence, the chancellor granted Deanna, Elizabeth, and Garnett’s motion to dismiss the claims against them. The trial proceeded on their counterclaim to remove Richard III as co-trustee.
¶ 26. At the close of trial, the chancellor granted their counterclaim and removed Richard III as co-trustee. The chancellor issued a seventy-one page opinion, finding eleven separate legal justifications for Richard Ill’s removal and disqualification from service as co-trustee:
a. Serious breach of trust. His conduct has violated the intent of the trust, which is to ensure and promote Wilbourn family influence and control of the Bank. Furthermore, he failed, refused and neglected to cooperate in voting the shares of *368 Marital Trust B, which is the sole discretionary function of the trust.
b. Lack of cooperation among co-trustees that substantially impairs administration of the trust. He has failed, refused and neglected to cooperate with the co-trustee, so that the shares of Marital Trust B have not been voted, and the lack of cooperation has been Richard Ill’s fault. The court finds that there is no other way to accomplish proper administration of the trust other than by removal of Richard III as co-trustee.
c. Unfitness, unwillingness or persistent failure of the co-trustee to administer the trust effectively, and the court finds that removal of the co-trustee would best serve the interests of the beneficiaries. His conduct has made effective administration of the trust impossible, and his removal would best serve the interest of the beneficiaries.
d. A substantial change in circumstances. Since Richard II’s death, Richard III set himself in an adversarial posture to Bank management, which is contrary to the situation established by the settlor and threatens the intent of Marital Trust B.
e. Removal is requested by all of the qualified beneficiaries, removal would be in the best interest of the beneficiaries, and removal will not be inconsistent with the purpose of the trust, and a suitable trustee is available. Removal has been requested by all of the qualified trustees, removal would be in the best interest of the beneficiaries, removal will not be inconsistent with the purpose of the trust, and a suitable co-trustee — Elizabeth Williamson — is available.
f. In cases where the trustee breaches his duty of loyalty by dishonest or improper acts, including engaging in professional misconduct. Richard Ill’s surreptitious tape recording of the co-trustee and at least one of the beneficiaries, and his attempts to persuade his mother to enter into various business arrangements that were not in her best interest, during a time when he claims she was incompetent, was disloyal, dishonest, and improper.
g. Engaging in self dealing or in actions that create a conflict between the trustee’s fiduciary duties and personal interests. Richard III has used the trust to promote his own self interest to the detriment of the trust and its beneficiaries.
h. Where the trustee has violated his duty of impartiality to multiple beneficiaries by failing to communicate with them according to their differing interests. By using the ploy of not voting the Marital Trust B shares to further his own interest, Richard III violated his fiduciary duties, including the duty to act impartially with respect to multiple beneficiaries.
i. Where there exists hostility by the trustee toward the beneficiary or mutual hostility created by the trustee, and the hostility has the potential to defeat the purposes of the trust. Richard III has acted adver-sarially and with hostility toward the beneficiaries, and they no longer trust or have confidence in him as a co-trustee.
j. In case of serious breakdown of communication between a trustee and the beneficiaries, especially where *369 the trustee is responsible or the breakdoum appears to be incurable. There has been a serious breakdown in communication stemming from Richard Ill’s actions, which have caused a breakdown in the relationship among the parties, and that breakdown appears to be, and is, incurable.
k. Where the trustee’s continuation in that role would be detrimental to the interests of the beneficiaries. The court finds that Richard Ill’s continuation as co-trustee would definitely be detrimental to the interests of the beneficiaries.
ISSUES ON APPEAL
¶27. Richard III appeals both the grant of Deanna, Elizabeth, and Garnett’s counterclaim to remove him as co-trustee and the dismissal of his claims to remove Deanna as co-trustee and for unpaid co-trustee fees.
¶28. In the event this court were to find reversible error and remand this case to chancery court, Richard III also appeals the transfer of venue from Madison County to Lauderdale County, arguing the ease should be retried in Madison County, his venue of choice. Because we affirm the judgment, it is not necessary to address his venue argument. But we do note that venue properly lay in Lauder-dale County.[1]
DISCUSSION
I. Removal of Richard III as Co-Trustee
¶29. As with any dispute, there are always two sides to the story. And Richard Ill’s version of what happened in 2006-2007 vastly differs from his family’s. According to Richard III, his family “teamed up” against him to have him removed as co-trustee, despite not being able to show Richard III mismanaged the trust or caused the Bank to lose profitability. The chancellor heard from both sides. He observed the demeanor and weighed the credibility of each family member involved, as well as other witnesses. And he concluded the evidence clearly and convincingly supported Deanna, Elizabeth, and Gar-nett’s claim.
*370 ¶ 30. Richard III acknowledges our deferential standard of review and that a reversal of the chancellor’s decision would require us to find no legal reason and no supporting factual basis for removal existed for any of the chancellor’s multiple findings of good cause to remove. With such a steep hill to climb, Richard III makes two general arguments about the chancellor’s findings: (1) the chancellor’s strong negative reaction to Richard Ill’s secret tape recordings biased the chancellor’s view of all the other evidence; and (2) the chancellor based his decision on actions by Richard III that had no relevance to his administration of Marital Trust B.
¶31. We find Richard Ill’s justifications for secretly tape recording his mother/fiduciary unpersuasive. And we find no error in the chancellor’s consideration of Richard’s actions beyond his ministerial duties as co-trustee as evidence of Deanna, Elizabeth, and Garnett’s distrust of Richard III as co-trustee. We also conclude the chancellor permissibly weighed Richard Ill’s self-dealing in other family matters as evidence of self-interest in administering Marital Trust B. Because substantial evidence supports the chancellor’s findings of breaches of fiduciary duties and hostility, we affirm the removal of Richard III as co-trustee.
A. Chancellor’s Authority to Remove
¶ 32. A court “has inherent power to remove the trustee for good cause, such power being incidental to the court’s paramount duty to see that trusts are properly executed, and the trust estate preserved, and as broad and comprehensive as the exigencies of the case may require.” Walker v. Cox, 531 So.2d 801, 803 (Miss.1988) (quoting Yeates v. Box, 198 Miss. 602, 612, 22 So.2d 411, 415 (1945)); see also Restatement (3d) of Trusts § 37 (2003) (“A trustee may be removed (a) in accordance with the terms of the trust; or (b) for cause by a proper court.”). “On sufficient grounds and pleadings a testamentary trustee may be removed, and a court of equity has the power to remove a testamentary trustee in protecting the beneficiaries.” Magee v. Estate of Magee, 236 Miss. 572, 589, 111 So.2d 394, 400-01 (1959) (citing Woods v. Chrissinger, 230 Ala. 678, 163 So. 318 (Ala.1935)).
¶ 33. The Mississippi Supreme Court has held “hostility of the trustee toward the successor income beneficiary could defeat the purpose of the trust,” giving the chancellor sufficient ground to remove the trustee for good cause. Walker, 531 So.2d at 804. A chancellor may also remove a trustee for a conflict of interest. McWilliams v. McWilliams ex rel. Weathersby, 994 So.2d 841, 846 (¶ 19) (Miss.Ct.App.2008) (citing 76 Am. Jur. 2d Trusts § 233 (2007)). “If a trustee has an interest in the administration of a trust that would interfere with the duty of complete loyalty, removal may be warranted.” Id. Further, “a serious breakdown in communications between beneficiaries and a trustee may justify removal, particularly if the trustee is responsible for the breakdown or it appears to be incurable. Serious friction between co-trustees may also warrant removal of one or both of them.” Restatement (3d) of Trusts § 37 cmt. e(l) (2003).
¶ 34. We review the chancellor’s decision to remove Richard for abuse of discretion. See McWilliams, 994 So.2d at 846 ( 16) (citing Walker, 531 So.2d at 803). “To disturb a chancellor’s factual findings, this Court must determine that the chancellor’s factual findings are manifestly wrong, clearly erroneous, or the chancellor abused his discretion.” Id. at 844 (13) (citing Hollon v. Hollon, 784 So.2d 943, 946 (¶ 11) (Miss.2001)). But we review questions of law de novo. McNeil v. Hester, *371 753 So.2d 1057, 1063 (¶ 21) (Miss.2000) (citations omitted).
B. Breach of Fiduciary Duties
¶ 35. “[A] trustee has a duty to act with due regard to his obligation as a fiduciary.” Miss.Code. Ann. § 91-9-107(2) (Supp.2011). A “fiduciary” is “required to act for the benefit of another person on all matters within the scope of their relationship,” owing “the duties of good faith, trust, confidence, and candor.” Black’s Law Dictionary 658 (8th ed. 2004). “The touchstone of the fiduciary relationship between the trustee and his beneficiaries is loyalty.” Jeffrey Jackson & Mary Miller, Encyclopedia of Mississippi Law § 73:8 (2001). This fundamental duty “underlies the relationship and imposes limitations upon the trustee in discharging his or her responsibilities.” Id. “The interests of the beneficiaries are paramount, and nothing should be done that would diminish their rights under the terms of the agreement and granted by law. One in a fiduciary position, such as a trustee, cannot take advantage of that position of trust in administering the assets entrusted to him or her.” Id. (citing Holmes v. Jones, 318 So.2d 865 (Miss.1975)).
¶ 36. The chancellor found (1) Richard Ill’s secret tape recordings of his co-trustee and beneficiary, Deanna, (2) his use of the trust in a way to ensure his position on the holding company board, (3) his conduct that caused his family to worry about the Wilbourn family’s influence over the Bank, and (4) his attempts to persuade Deanna to make business decisions that were not in her best interest while at the same time trying to get her declared incompetent were all breaches of his duties of trust and impartiality. We address Richard Ill’s arguments against each of these findings.
1. Secret Tape Recordings
¶ 37. The chancellor dedicated twelve pages of his opinion to his findings regarding Richard Ill’s secret tape recordings. According to Richard, the chancellor’s strong reaction against the tape recordings was disproportionate and tainted all the chancellor’s remaining factual findings. Richard III claims the chancellor erroneously applied the law to find that an attorney’s secret tape recording is always unethical. Had the chancellor applied the correct test, Richard argues, the chancellor would have concluded Richard Ill’s actions were reasonable.
¶ 38. Richard III is correct that the Mississippi Supreme Court does not impose a per se ban on surreptitious tape recordings by attorneys. Attorney M v. The Miss. Bar, 621 So.2d 220, 223-24 (Miss.1992) (finding attorney’s tape recording of a conversation with an expert witness was not unethical). Instead, the supreme court looks at the secret tape recording “within the context of the circumstances then existing” to determine whether the recording “rise[s] to the level of dishonesty, fraud, deceit or misrepresentation.” Id. at 223 (quoting Netterville v. Miss. State Bar, 397 So.2d 878, 883 (Miss.1981)). “Ethical complications arise not so much from surreptitious recordings per se as from the manner in which attorneys use them.” Id. at 224. And “an attorney who uses a secret recording for blackmail or to otherwise gain unfair advantage has clearly committed an unethical — if not illegal— act.” Id.
¶ 39. In reading the chancellor’s opinion, it is clear he applied the correct test, considering the manner in which Richard III intended to use the recordings. The chancellor rejected Richard Ill’s explanation — that his purpose for secretly recording his mother was to have a “true record” of their conversations — as *372 not supported by the evidence. Instead, the chancellor found Richard Ill’s purpose was to gather negative evidence against his mother, whom he was trying to have declared incompetent and, later, to have removed as co-trustee. Under the circumstances, in which Richard III was simultaneously acting as his mother’s attorney, advisor, and co-trustee, the chancellor found Richard III was taking an unfair advantage of Deanna.
¶ 40. We find the evidence that Richard III was secretly tape recording Deanna for his own purposes sufficient to support the chancellor’s finding Richard III had breached his duty of loyalty. As Deanna’s fiduciary, Richard III owed her duties of good faith, trust, and candor. Deanna testified that Richard Ill’s actions destroyed her trust in him. And it was her learning about the recordings that led to the breakdown of communication between her and Richard III as co-trustees, which the chancellor found was another reason for removal. See Restatement (3d) of Trusts § 37 cmt. e(l) (2003). Further, Richard III continued taping his mother after he promised he would stop, adding to Deanna’s distrust of him. Thus, we find no error in the chancellor’s holding Richard Ill’s surreptitious tape recordings justified his removal as co-trustee based on breach of his fiduciary duty.
2. Failure to Vote Shares
a. Diluting Control / Ensuring

He Remained on the Board

¶41. According to Richard III, voting the Marital Trust B’s shares was merely “incidental” to his administrative duties of managing the Trust. So the voting impasse in March 2007 cannot be a basis for removal because the administration of the trust was not substantially impaired by the co-trustees’ failure to vote. The chancellor saw the events surrounding March 2007 very differently. It was not that Richard III failed in his ministerial duties as co-trustee or merely had an honest disagreement with this co-trustee over the holding company board’s slated directors. Instead, the chancellor found Richard III “exploited] the benefit he stood to gain in the impasse” and “put his own personal interests ahead of those of the trust and its beneficiaries.” And Richard Ill’s misuse of his co-trustee power was a violation of his fiduciary duties that in itself justified removal.
¶ 42. Further, the chancellor found voting the shares was an important discretionary function of Marital Trust B. He reasoned that by casting their votes, the co-trustees would effect Richard II’s intent that his immediate family continue control over the Bank. Because Richard II clearly intended that his family maintain their significant investment in the Bank, the terms of the trust restricted the co-trustees from voting Trust shares in a manner that would dilute his family’s “voting power of ownership” over the Bank without unanimous consent. By refusing to vote the shares, Richard III endangered his family’s control of the bank, allowing his immediate family’s votes to drop from a 52% majority to only 30%. His intentional and calculated inaction also prominently displayed his self-interest of ensuring he had sufficient votes to remain on the holding company Board. The chancellor found Richard Ill’s actions not only violated the terms of the trust but also evidenced his putting his interests before his beneficiaries. Under the circumstances, we find no error in the chancellor holding Richard Ill’s refusal to vote the Marital Trust B shares violated both his fiduciary duties and also his duties as co-trustee.

b. The January 30, 2007 Letter

¶ 43. Richard III also claims the chancellor relied on inadmissible evidence to *373 support the conclusion Richard III refused to vote the shares as a means to promote his own interest. According to Richard III, the January 30, 2007 letter to Archie Jr. and Deanna was part of a settlement negotiation and, thus, inadmissible under Mississippi Rule of Evidence 408. Under Rule 408:
Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.
¶ 44. For two reasons, we find the January 30, 2007 letter falls outside the scope of Rule 408. First, “Rule 408 only bars the use of compromise evidence to prove the validity or invalidity of the claim that was the subject of the compromise, not some other claim.” Charles Alan Wright and Kenneth W. Graham Jr., 23 Fed. Prac. & Proc. Evid. § 5314, at n. 25 (1st ed. 1980); see also Broadcort Capital Corp. v. Summa Med. Corp., 972 F.2d 1183, 1194 (10th Cir.1992) (holding “Rule 408 did not bar ... evidence ... related to settlement discussions that involved a different claim than the one at issue in the current trial”); Vulcan Hart Corp. v. NLRB, 718 F.2d 269, 277 (8th Cir.1983) (holding “Rule 408 excludes evidence of settlement offers only if such evidence is offered to prove liability for or invalidity of the claim under negotiation”). The January 30, 2007 letter was not about settling the co-trustee removal issue — the only issue at trial. Instead, the letter was about Richard Ill’s claim against the holding company board for his removal as chairman and for his removal from the Bank board, as evidenced by its recipients, Deanna and Archie Jr., a member of the holding company board who has no role in Marital Trust B. While the letter may not be admissible in a dispute between the holding company and Richard III, we find Rule 408 does not apply to its admissibility in the dispute between Richard III and his family.
¶45. Second, “Rule 408 is also inapplicable when the claim is based upon some wrong that was committed in the course of the settlement discussions; e.g., libel, assault, breach of contract, unfair labor practice, and the like.” Wright & Graham, 23 Fed. Prac. & Proc. Evid. § 5314 (1st ed. 1980). See also Avary v. Bank of Am., N.A., 72 S.W.3d 779, 799 (Tex.Ct.App.2002) (holding Texas’s version of Rule 408, which is identical to Mississip pi’s, “does not prevent a party from proving a separate cause of action simply because some of the acts complained of took place during compromise negotiations”); Fletcher v. W. Nat’l Life Ins. Co., 10 Cal. App.3d 376, 396, 89 Cal.Rptr. 78 (Cal.Ct.App.1970) (finding settlement letter from insurer admissible because it was not used to prove liability under the policy but instead “proof of the instrumentality of the tort” of intentional infliction of emotional distress). Deanna, Elizabeth, and Gar-nett’s claim was that Richard III misused his authority as co-trustee to gain leverage in his attempt to regain his seat on the holding company board. In the letter he proposed not voting the Marital Trust B shares because without him he would be re-elected to the holding company board through his and his uncle’s shares. Thus, the letter was admissible as “proof of the instrumentality” of his breach of his fiduciary duties as co-trustee. Fletcher, 10 Cal.App.3d at 396, 89 CaLRptr. 78.
*374 3.1999 Memorandum of Agreement
¶ 46. Richard III also argues the chancellor improperly considered the 1999 memorandum of agreement between himself and his father. Because this agreement was personal to Richard II, Richard III claims it could not be used to impose additional duties on Richard III as co-trustee and certainly could not be used to find a breach of those duties.
¶47. Richard III is correct that the agreement could not be used to prove Richard III had additional co-trustee duties that he did not fulfill. See e.g., Hous. Auth., City of Laurel v. Gatlin, 738 So.2d 249, 251 (¶ 10) (Miss.Ct.App.1998) (quoting Allen v. Allen, 175 Miss. 735, 741, 168 So. 658, 659 (1936)) (“Parol evidence is not admissible to contradict, vary, alter, add to, or detract from, the instrument.”). But that does not make the document inadmissible for other purposes. Deanna, Elizabeth, and Garnett testified they were hesitant when Archie Jr. nominated Richard III to succeed his father, citing their father’s reservations about putting Richard III on the board, as shown in the agreement. Further, the agreement did not contradict the terms of the trust. Both the agreement and the will were executed the same year. Both expressed Richard II’s belief in the importance of the Bank to his family’s long-term financial success. Thus, the agreement was relevant to whether Richard III was managing Marital Trust B in a way that promoted Richard II’s intention. Because the chancellor did not use the agreement to add to the terms of the trust, we find no abuse of discretion in the chancellor’s consideration of the agreement, particularly when Richard III did not object to its admission at trial.
4.Bank Operations
¶ 48. At both the trial and on appeal, Richard III has argued that all evidence about his interactions with Archie Jr. and the Bank is irrelevant to his actions as co-trustee of Marital Trust B. Further, he suggests there is no evidence Richard Ill’s behavior threatened the Bank’s bottom line. As with the failure to vote the shares, the chancellor found Richard Ill’s interactions with the Bank to be part of the bigger picture of Richard III choosing his interests when they were found to be in conflict with his family’s.
¶ 49. The chancellor found Richard Ill’s enmity toward Archie Jr. was a “legitimate cause of anxiety and concern” for Deanna, Elizabeth, and Garnett. As beneficiaries to Marital Trust B, they had a right to be concerned with the Bank’s profitability. The chancellor did not conclude Richard III had to be removed as co-trustee because he made the Bank unprofitable. The chancellor concluded Richard III breached his fiduciary duties to his beneficiaries because he refused to listen to his family’s concerns and insisted on placing his own interest before theirs. We reject Richard Ill’s argument that the chancellor should have compartmentalized Richard Ill’s various roles. Richard Ill’s actions as Bank board chairman are relevant because at the time he was simultaneously co-trustee, owing complete loyalty to his beneficiaries. See McWilliams, 994 So.2d at 846 (¶ 19). And we find the chancellor’s conclusion that Richard III violated his duty of loyalty by choosing his interest over the interests of his beneficiaries, when those interests were in conflict, is supported by the evidence of Richard Ill’s reactions to their concerns.
5.Other Family Matters
¶ 50. Equally irrelevant to the chancellor’s decision, according to Richard III, were Richard Ill’s actions in “other family and business matters”—namely, (1) the purchase of a condominium in Florida and a potential lawsuit connected with it; *375 (2) the attempt to secure a loan for another family business, Inn Serve, though Deanna’s personal guarantee; and (3) the creation of the Providence Trust and Richard Ill’s plans to purchase the Marital Trust B shares. Just as he attempts to minimize his interactions with the Bank, Richard III argues his actions in these other matters have no bearing on his performance as co-trustee. Again, we find no error in the chancellor’s refusal to view Richard Ill’s actions in these family matters in a vacuum.[2]
¶ 51. The Florida condominium was relevant because the evidence showed Richard III legally represented Deanna concerning this property. So Richard III and Deanna were in an attorney-client relationship, reinforcing Richard Ill’s ethical duties to his mother, which the chancellor found Richard III breached.
¶ 52. The Inn Serve loan’s relevance centers on Richard Ill’s request to his mother that she guarantee a $12 million loan for a business she did not own. And at the time Richard III made the request, he was gathering evidence to build a case for his mother’s incompetence. The chancellor found Richard III was self-dealing and had abused his mother’s trust for his own financial gain. We find no error in the chancellor concluding that if Richard Ill’s family could not trust him in these other roles, they could not trust him as co-trustee of Marital Trust B.
¶ 53. Like the chancellor, we too find “the fact Richard III wanted the Marital Trust B shares put under his control in the Providence Trust is a matter of concern.” Despite Richard Ill’s argument that all the beneficiaries initially responded positively to his proposal, seeing it as a way to avoid estate taxes upon Deanna’s death, we cannot ignore that Richard Ill’s proposal clearly violated the express terms of the trust. The trust restricted Richard III and Deanna from selling the stock to “any person other than [Deanna] during her lifetime.” And had Deanna gone through with the plan, she would not have received the annual dividends of Richard IPs Bank shares, as Richard II directed in the terms of the trust. Also, Richard III, Elizabeth, and Deanna would not have received the shares upon Deanna’s death, as Richard II directed. Further, Richard II created Marital Trust B to have two co-trustees, both of whom could be revoked under the terms of the trust and had to be replaced by another immediate family member if available. In contrast, Richard III was the only family-member trustee of the Providence Trust. He could not be revoked, and he had the authority to appoint a non-family member as his co-trustee. Thus, we agree with the chancellor that the “fact Richard III, as co-trustee with and fiduciary of Deanna, would try to convince Deanna to enter into such an arrangement is evidence ... that Richard III put his own interest ahead of his beneficiaries’] and that he was not willing to adhere to [his] father’s intent in setting up Marital Trust B.”
C. Hostility Created by the Trustee
¶ 54. The chancellor also found hostility created by Richard III formed another basis for removal.
*376 ¶ 55. In Walker v. Cox, the Mississippi Supreme Court considered hostility between trustee and beneficiary as a reason to remove a trustee. The supreme court quoted a treatise for the following proposition:
Disagreement and unpleasant personal relationships between the trustee and the beneficiaries are not usually enough to warrant removal. The beneficiary often conceives that he could manage the trust better than the trustee, resents failure to follow his advice, is dissatisfied with returns, thinks that the trustee is too conservative in his investment policies, and otherwise finds fault with the trustee. Thus, friction develops. But the settlor has entrusted the management to the trustee and not to the beneficiaries. The very fact that he created a trust showed that he did not want the beneficiaries to be the controlling factor in the management of the property. However, in some instances the hostile relationship between the trustee and the beneficiary have gone so far that the court feels a new trustee should be appointed.
Walker, 531 So.2d at 804 (quoting George G. Bogart, The Law of Trusts and Trustees § 160 (5th ed. 1973)) (emphasis added). The supreme court also considered the Court of Appeals of Arkansas’s position on hostility, noting: “[M]utual hostility between the beneficiaries and the trustee is a sufficient ground for the court to remove the trustee if 1) the provisions of the instrument creating the trust require mutual interchange of ideas, and 2) if the hostility tends to defeat the purpose of the trust.” Id. (quoting Ashman v. Pickens, 12 Ark. App. 233, 674 S.W.2d 4, 5 (1984)). “Finding the reasoning of Ashman persuasive,” the Mississippi Supreme Court determined “the better rule to be that hostility of the trustee toward the successor income beneficiary could defeat the purpose of the trust.” Id. (emphasis added). Thus, the supreme court appeared to reject mutual hostility as a ground to remove. Instead the test appears to be hostility of the trustee toward the beneficiary that defeats the purpose of the trust. See id.
¶ 56. In McWilliams, the removed trustee argued that if hostility existed it was not created by the trustee. This court reversed the chancellor’s finding of hostility as a basis to remove the trustee. McWilliams, 994 So.2d at 849 (¶ 28). But see id. at 849-50 (¶¶ 28-30) (affirming the chancellor’s removal of the trustee for conflict of interest). This court held “[wjhere evidence shows that a guardian of a beneficiary or the actual beneficiary creates hostility as a part of a greater goal to have a trustee removed, that guardian or beneficiary will be sorely disappointed.” Id. (citing 76 Am. Jur. 2d Trusts § 235 (2007)).
¶ 57. Relying on Walker and McWil-liams, Richard III asserts the chancellor misapplied the law on hostility. He argues, because Deanna, Elizabeth, and Gar-nett created the hostility in an effort to have Richard III removed as co-trustee, they were not entitled to removal on this ground. But the chancellor did not find Deanna, Elizabeth, and Garnett had created the hostility. Instead, the chancellor found Richard III had created the hostility through his adversarial acts — his secret tape recordings, his interactions with Bank officers that made his family uneasy, and his refusal to cooperate with Deanna to vote the shares of Marital Trust B. We find substantial evidence supports that Deanna, Elizabeth, and Garnett’s April 2007 attempted removal of Richard III was a reaction to Richard Ill’s actions, not the type of beneficiary-initiated friction that McWilliams held could not be a basis to remove.
*377 ¶ 58. Richard III next argues the hostility between himself and his family did not defeat the purpose of the Trust. We have already rejected Richard Ill’s argument that voting the shares in the March 2007 holding company meeting was a mere “incidental” duty. One of the purposes of the Marital Trust B was to keep Richard II’s shares in the control of his immediate family until their distribution at Deanna’s death. Not voting the shares diminished the Wilbourn family’s voting power over the holding company board. But even under Richard Ill’s argument that the purpose of the Trust was to provide dividends, not voting the shares affected this purpose. It is the holding company board that determines the annual dividend— which Richard II provided would be Deanna’s income until her death. By not being able to agree how to vote the Trust shares, one of the purposes of the Trust — overseeing the annual income of Trust property through electing the holding company board — was defeated.
¶ 59. Finding the chancellor properly applied the law from Walker and McWil-liams to the facts, we affirm the chancellor’s holding Richard III should be removed as co-trustee based on his hostility toward his beneficiaries that defeated the purpose of the Trust.
II. Dismissal of Richard Ill’s Claims
¶ 60. Richard also appeals the involuntary dismissal under Mississippi Rule of Civil Procedure 41(b) of his claims (1) to remove Deanna as co-trustee and prevent Elizabeth or Garnett from replacing her and (2) to be compensated for his services as co-trustee.
¶ 61. Rule 41(b) permits:
After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court may then render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence.
M.R.C.P. 41(b). A motion to dismiss is different than a motion for directed verdict. When a defendant moves for an involuntary dismissal under Rule 41(b), “the judge should consider ‘the evidence fairly, as distinguished from in the light most favorable to the plaintiff,’ and the court should dismiss the case if it would find for the defendant.” In re Adoption of D.N.T., 848 So.2d 690, 711 (¶50) (Miss.2003) (quoting Century 21 Deep S. Props., Ltd. v. Corson, 612 So.2d 359, 369 (Miss.1992)). “The [judge] must deny a motion to dismiss only if the judge would be obliged to find for the plaintiff if the plaintiffs evidence were all the evidence offered in the case.” Id. “This Court applies the substantial evidence/manifest error standards to an appeal of a grant or denial of a motion to dismiss pursuant to [Rule] 41(b).” Id.
A. Removal of Deanna
¶ 62. Richard III argues the chancellor manifestly erred by finding, at the end of his case, that the evidence did not oblige him to remove Deanna and prevent Elizabeth and Garnett from serving as successor trustees. In the midst of very general assertions about his evidence, Richard III specifically claims: (a) his mother and sisters’ attempt in April 2007 to remove him as co-trustee is evidence of their self-dealing and hostility; and (b) Deanna disregarded “the distinct identity of the Trust,” by asking that the trust statements be sent to her, by refusing to meet with Richard, and by trying to vote the trust shares without Richard Ill’s con *378 sent. We must ask whether this evidence, fairly viewed, is substantial enough to require the chancellor to rule in Richard Ill’s favor if no other evidence was presented. See id.
¶ 63. Richard III called all three defendants as hostile witnesses during his casein-chief. The chancellor found credible their explanations for why they attempted to remove Richard III as co-trustee under the terms of the will and for why Deanna attempted to vote the shares in an effort to maintain family control of the holding company. The chancellor held all three defendants had acted in good faith. As this is a fair view of their testimony, we find no error in the chancellor’s dismissal of Richard Ill’s claim to remove Deanna.
B. Trustee fees
¶ 64. Richard III also appeals the dismissal of his claim for trustee fees for the time period of April 2007 (time of the attempted removal by his family) through the end of 2008. If there is record evidence Richard III provided trustee services during this period, then this court must ask whether Richard Ill’s actions warranted forfeiture of that fee:
Obviously a trustee is entitled to receive compensation for such services and expenditures as are within the line of his duties. [B]ut [compensation] may be forfeited or reduced in the discretion of the court for bad faith, conversion, commingling of funds, or other improper conduct.... “Each case must be determined largely on its own peculiar facts, due weight being given by the appellate court to the findings of the lower tribunal. The facts justifying forfeiture must be clearly shown; and in the absence of sufficient evidence thereof, the right to compensation is not forfeited.”
Sunflower Farms, Inc. v. McLean, 238 Miss. 168, 184, 117 So.2d 808, 815 (1960) (quoting 90 C.J.S. Trusts § 397) (internal citations omitted). Richard III briefly claims he is entitled to $90,663.88 plus interest. But he does not argue that during this time period he performed any work for the trust or point to any evidence supporting this claim. The terms of Marital Trust B provide for a 6% fee “for normal services of disbursement and voting said stock, execution of proxies or other services of a minor or profunctory [sic] nature.” In April 2007, when the removal letter was sent, Deanna took control of the trust’s bank account. And while the lawsuit was pending, Richard III was enjoined from voting the trust shares. Because Richard III has presented no record evidence of trust services and expenditures during the relevant time period entitling him to compensation, we find no manifest error in the chancellor’s dismissal of this claim.
¶ 65. THE JUDGMENT OF THE LAUDERDALE COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING, P.J., BARNES, ISHEE, CARLTON, RUSSELL AND FAIR, JJ., CONCUR. GRIFFIS, P.J., AND ROBERTS, J., NOT PARTICIPATING.

. “Venue is a function of statute.” Park on Lakeland Drive, Inc. v. Spence, 941 So.2d 203, 206 (¶ 8) (Miss.2006) (quoting Flight Line, Inc. v. Tanksley, 608 So.2d 1149, 1155 (Miss.1992)). Mississippi Code Annotated section 11-5-1 (Rev. 2002) governs venue for chancery actions. It states, in pertinent part, “suits respecting real or personal property may be brought in the chancery court of the county in which the property, or some portion thereof, may be; and all cases not otherwise provided may be brought in the chancery court of any county where the defendant, or any necessary party defendant, may reside or be found[J” Id.
Contrary to Richard Ill’s assertion, his lawsuit was not merely about ownership of the personal property belonging to the trust, establishing venue where the stock certificates were located. Cf. Herring Gas Co. v. Newton, 941 So.2d 839, 841-42 (¶7) (Miss.Ct.App.2006) (holding, because action to compel issue of stock certificates was an action involving personal property, venue lay in county where certificates were located and not just in county were corporation located). Instead, the suit was about a testamentary trust- — its administration, the enforcement of its terms, and performance and payment of its trustees. Thus, the "all cases not otherwise provided" language governs, making venue proper in Lauderdale County, where Deanna, the only resident defendant and only necessary party, lived. See Miss.Code Ann. § 11-5-1; see also Miss.Code Ann. § 91-9-203 (Rev. 2004) ("In any court proceeding to designate a successor trustee or to settle the accounts of the existing trustee, only the beneficiaries then entitled to participate in income and those principal beneficiaries who have a vested interest in the trust estate shall be necessary parties thereto.”).

. Richard was simultaneously arguing for his mother's removal and his sisters’ ban as co-trustees. In making his case for his mother's breach of duties and/or hostility, Richard III points out his mother's actions beyond her administrative duties as co-trustee. For example, one issue listed in the pretrial order is whether Deanna breached any duties by paying for Richard Ill’s wife’s attorney in his wife's unsuccessful attempt to obtain a divorce. If the totality of Deanna's actions were relevant to Richard Ill's claim against Deanna, then it stands to reason the same is true for Deanna’s claim against Richard III.