994 So.2d 841 (2008)
John H. McWILLIAMS, Appellant,
v.
D. Rials McWILLIAMS, By and Through his Mother and Natural Guardian, Jane WEATHERSBY, and Frank L. McWilliams, Appellees.
No. 2007-CP-01029-COA.
Court of Appeals of Mississippi.
July 22, 2008.
Rehearing Denied November 18, 2008.
*842 John H. McWilliams, Indianola, pro se.
Lindsey C. Meador, Hollie R. Moore, Cleveland, attorneys for appellees.
Before LEE, P.J., IRVING and ROBERTS, JJ.
ROBERTS, J., for the Court.
¶ 1. This is the second appeal centered around a warranty deed and an irrevocable trust settled by Frank McWilliams, an attorney, while he was incarcerated for burglary. Frank named his son, D. Rials McWilliams, as the beneficiary of that trust. Frank's brother, attorney John McWilliams, drafted the trust. Frank appointed John as the sole trustee.
¶ 2. More than six years later, Frank filed a motion to set the trust aside. The Sunflower County Chancery Court found that Frank's complaint was barred by the statute of limitations. Frank appealed that decision, but this Court affirmed the judgment of the chancery court.
¶ 3. While Frank's appeal was pending, Rials, by and through his mother, Jane Weathersby, filed a petition to remove John as the trustee. The chancellor found that during Frank's attempt to have the trust set aside, John took a position adverse to Rials and, as a result, "a conflict of interest . . . [arose] which . . . fostered hostility between [Rials] and [John]." Consequently, the chancellor removed John as the trustee. John appeals. Finding no error, we affirm the judgment of the chancery court.

FACTS AND PROCEDURAL HISTORY
¶ 4. A little background information is necessary to discuss the relationships of all the interested parties. Frank and Jane divorced sometime prior to these proceedings, *843 but the exact date of their divorce is not mentioned in the record. They had one son, Rials. At the time of the May 3, 2007, hearing that led to this appeal, Rials was eighteen years old.
¶ 5. As of April 22, 1999, Frank was incarcerated for burglary. Without any request from Frank, John drafted an irrevocable trust and a warranty deed. There are multiple possible interpretations of John's intent in presenting Frank with an unrequested trust and deed. However, John's testimony indicates that a fair interpretation was to avoid creditors, including any potential judgment creditors that might result from Frank's burglary. John was aware that Frank would take a twenty-five percent interest from their mother's estate, which included more than four hundred acres and multiple buildings, and John did not want to have to contend with any of Frank's judgment creditors in their mother's estate. John drafted the trust, placed another attorney's name on it, and backdated it to September 1998 to avoid appearing as though it was prepared on the eve of litigation. Frank executed the documents while incarcerated, and John took it to a notary public, who notarized the documents without having personally witnessed Frank's signature.
¶ 6. In any event, the deed conveyed Frank's "right, title and interest in and to any real or personal property now owned or hereafter acquired by [Frank] in [real property owned by Frank and John's mother]." At that time, the trust had no assets. John presented the deed and the trust to Frank the next day, while Frank was still incarcerated. Frank named his son, Rials, as the trust beneficiary and appointed John as the sole trustee.
¶ 7. More than six years later, Frank moved to set aside the warranty deed and trust based on allegations of fraud, undue influence, overreaching, and lack of mental capacity. Frank named Rials and John, individually, and John also in his capacity as the trustee, as defendants. Rials filed a motion for summary judgment, arguing that Frank was barred by the applicable statute of limitations from setting aside the trust. The chancellor granted Rials's motion and held that Frank's motion was time-barred. Frank appealed, but this Court affirmed the chancellor's decision in McWilliams v. McWilliams, 970 So.2d 200, 204(¶ 11) (Miss.Ct.App.2007).
¶ 8. However, on February 26, 2007  while Frank's appeal was still pending-by and through Jane, Rials filed a petition to have John removed as the trustee. Rials claimed that John had an "inherent conflict of interest" because of his relationship with Frank. John answered and argued that there was no legal or equitable basis to remove him as the trustee. John denied he had an inherent conflict of interest. Finally, John claimed that because Frank's appeal was still pending before this Court, the chancery court lacked jurisdiction to consider Rials's petition.
¶ 9. On May 3, 2007, the chancellor conducted a hearing on Rials's petition. John and Jane both testified. Ultimately, the chancellor entered an order to remove John as the trustee. John appeals.

ANALYSIS

I. WHETHER THE CHANCERY COURT HAD JURISDICTION TO REMOVE JOHN AS THE TRUSTEE WHILE FRANK'S APPEAL WAS PENDING.
¶ 10. John argues that the chancellor had no jurisdiction to remove him as the trustee. John's reasoning is based on the proposition that the chancellor lacked jurisdiction because Frank had appealed the chancellor's decision to grant Rials's motion for summary judgment and that *844 appeal was pending. Whether a court had jurisdiction is a question of law. Trustmark Nat'l Bank v. Johnson, 865 So.2d 1148, 1150(¶ 8) (Miss.2004) (citations omitted). We conduct a de novo review of jurisdictional questions on appeal. Id.
¶ 11. "[T]he filing of a notice of appeal transfers jurisdiction of a matter from the lower court to this Court." McNeil v. Hester, 753 So.2d 1057, 1075(¶ 68) (Miss.2000). Once a matter has been appealed, the lower court has no authority to "broaden, amend, modify, vacate, clarify, or rehear" its prior decision. Id. at 1076(¶ 68). John claims the chancellor's decision to remove him as the trustee broadened the former order by which the chancellor found that Frank was time-barred in his attempt to set aside the trust. By John's reasoning, the chancellor's decision changed the identities of the parties to the appeal and divested him of any ability to act as trustee, including signing and filing pleadings.
¶ 12. We find that the chancellor did not broaden, amend, modify, or reconsider his judgment that Frank was time-barred when he removed John as the trustee. The sole issue within Frank's appeal was whether Frank's motion to set aside the trust was barred by the statute of limitations. McWilliams, 970 So.2d at 202(¶ 5). Whether John should remain as the trustee was not at issue during that appeal. Because Frank's appeal solely focused on whether Frank was time-barred in seeking to set aside the trust, the chancery court maintained jurisdiction over the general operation of the trust. Accordingly, we find no merit to John's first argument.

II. WHETHER THE CHANCELLOR ERRED WHEN HE TOOK JUDICIAL NOTICE THAT JOHN HAD AN ADVERSE POSITION TO RIALS.
¶ 13. Paragraph three of the chancellor's order states:
Further, the Court takes judicial notice that in the hearing on [the] Motion for Summary Judgment filed on behalf of the minor through his own counsel, the Trustee took an adverse position to that of the minor and argued against same. At a hearing in this cause on this matter, the Trustee indicated that he was participating in the appeal along the same lines in which he argued earlier, and that is against the position taken by the minor through counsel. His position being contrary to that of the beneficiary and further being exacerbated by his relationship to his brother, a conflict of interest has arisen which has fostered hostility between the beneficiary and the Trustee.
According to John, the chancellor erred when he took judicial notice that he took a position adverse to Rials during the hearing on Rials's motion for summary judgment regarding Frank's motion to set aside the trust. To disturb a chancellor's factual findings, this Court must determine that the chancellor's factual findings are manifestly wrong, clearly erroneous, or the chancellor abused his discretion. Hollon v. Hollon, 784 So.2d 943, 946(¶ 11) (Miss. 2001) (citation omitted).
¶ 14. Pursuant to Mississippi Rule of Evidence 201(b), "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Mississippi Rule of Evidence 201(e) provides that "[a] party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed." Rule 201(e) goes on to *845 state, "[i]n the absence of prior notification, the request may be made after judicial notice has been taken." (Emphasis added). Rule 201(e) expressly provided John with a mechanism to challenge the chancellor's decision to take judicial notice of John's adverse position. The record contains no indication that John requested to be heard regarding the chancellor's taking judicial notice. That is, if John ever requested to be heard regarding the chancellor's taking judicial notice, the record does not contain that request. As far as we can tell, John never put the issue before the chancellor. Accordingly, this issue is procedurally barred on appeal. See Kennedy v. Kennedy, 662 So.2d 179, 183 (Miss.1995) (holding that a chancery court cannot be held in error for taking judicial notice where the party fails to avail himself of the opportunity to request a hearing or to proffer evidence contrary to the matter).
¶ 15. John cites the following language from Eidt v. City of Natchez, 421 So.2d 1225, 1231 (Miss.1982), "[f]airness and due process require that whenever the court at trial level is contemplating taking judicial notice of a particular fact or facts as a basis for calculation and fact findings, notice must be afforded to the party or parties who will be affected by the taking of such notice." Eidt predated the Mississippi Rules of Evidence.[1] Mississippi Rule of Evidence 201(f) provides that "[j]udicial notice may be taken at any stage of the proceeding." Advance notice that judicial notice will be taken is not required. Kennedy, 662 So.2d at 183. Moreover, Rule 201(e) provided John with a mechanism to challenge the chancellor's decision to take judicial notice after the fact. As stated in the official comments to Rule 201(e), "[b]ecause frequently there is no advance notice that judicial notice will be taken, a party has a right to be heard even after judicial notice has been taken." John did not take advantage of that mechanism because he did not raise the issue before the chancery court. Accordingly, we will not consider this issue on appeal.

III. WHETHER THE CHANCELLOR ERRED WHEN HE REMOVED JOHN AS TRUSTEE.
¶ 16. By way of his petition for removal, Rials alleged that John failed to defend the trust against Frank's complaint to have the trust set aside. According to Rials, John was "placed in the position of having to serve two masters"; as a result, John had an "inherent conflict of interest." The chancellor found:
The trustee in this matter is placed in a precarious position. As the brother of the plaintiff in this cause and the uncle of the sole beneficiary of the trust, in his capacity as trustee he would no doubt like to appease and satisfy both parties. When this suit was instituted by his brother, he responded as trustee, but there is no evidence of any communication between he [sic] and the beneficiary or the beneficiary's guardian and natural mother in light of the fact that he is a minor as to legal representation of the minor or as to the legal proceedings in general. Further, the Court takes judicial notice that in the hearing on [the] Motion for Summary Judgment filed on behalf of the minor through his own counsel, the trustee took an adverse position to that of the minor and argued against same. At a hearing in this cause on the matter, the trustee indicated that he was participating in the appeal along the same lines in which he argued earlier *846 and that is against the position taken by the minor through counsel. His position being contrary to that of the beneficiary and further being exacerbated by his relationship to his brother, a conflict of interest has arisen which has fostered hostility between the beneficiary and the trustee.
The chancellor then found that it was in Rials's best interest to remove John as the trustee. Accordingly, the chancellor removed John as trustee and appointed the Sunflower County Chancery Clerk as the temporary trustee. However, the chancellor made it "explicitly clear that this removal of [John] is not prompted by any wrongdoing on the part of [John], but so as to avoid further conflicts of interest and to calm the hostility which exists between he [sic] and [Rials] and [Jane]." John claims the chancellor committed reversible error when he removed him as the trustee. Our review of the chancellor's decision requires that we determine whether the chancellor abused his discretion when he removed John as the trustee. Walker v. Cox, 531 So.2d 801, 803 (Miss.1988).
¶ 17. Broadly speaking, upon an affirmative finding that a beneficiary established the allegations based on a petition for removal, a chancellor has the authority to remove a trustee for good cause. Miss.Code Ann. § 91-9-303 (Rev.2004); Walker, 531 So.2d at 803 (quoting Yeates v. Box, 198 Miss. 602, 612, 22 So.2d 411, 415 (1945)). The chancellor's removal power is part of the chancellor's paramount duty to see that trust estates are preserved and that trusts are properly executed. Walker, 531 So.2d at 803.
¶ 18. John and Jane both vigorously argue whether the chancellor did or did not abuse his discretion when he found that John was hostile to Rials. John and Jane seem to interpret the chancellor as having removed John on the basis of hostility. We do not interpret the chancellor's order as such. Instead, we interpret the chancellor as having found that removal was proper based on John's conflict of interest. The chancellor specifically stated that he removed John to prevent further conflicts of interest. The chancellor mentioned that John's conflict of interest resulted in hostility, but the chancellor never stated that hostility was the basis for removal. Consequently, our review requires that we analyze the chancellor's decision for an abuse of discretion based upon a finding of a conflict of interest, rather than a finding of hostility. After careful consideration, we cannot find that the chancellor abused his discretion when he removed John as trustee based on a conflict of interest.
¶ 19. Trustees may be removed for conflicts of interest. 76 Am. Jur.2d Trusts § 233 (2007). If a trustee has an interest in the administration of a trust that would interfere with the duty of complete loyalty, removal may be warranted. Id. When a trustee, because of a conflict of interest, fails or refuses to pursue a claim that would benefit a trust estate, that conflict renders the trustee incapable of performing his fiduciary duties. Ramsdell v. Union Trust Co., 202 Conn. 57, 519 A.2d 1185, 1186 (1987). Under those circumstances, removal is warranted. Id. The Connecticut Supreme Court's reasoning in Ramsdell is certainly not binding upon us, but we find it persuasive. Additionally, the converse is also true. That is, where a trustee fails or refuses to defend a claim that would harm a trust estate, removal may also be warranted. Mississippi statutory law supports this concept.
¶ 20. "A trustee has the power to perform. . . every act which a prudent man would perform for the purposes of the trust." Miss.Code Ann. § 91-9-107(1) *847 (Supp.2006). Further, "a trustee has the duty to act with due regard to his obligation as a fiduciary." Miss.Code Ann. § 91-9-107(2) (Supp.2006). The Uniform Trustees' Powers Law grants trustees several specific powers. Miss.Code Ann. § 91-9-107(3) (Supp.2006). One of those powers is the power "[t]o prosecute or defend actions, claims or proceedings for the protection of trust assets and of the trustee in the performance of his duties." Miss.Code Ann. § 91-9-107(3)(y) (Supp. 2006).
¶ 21. Jane claims that John's hostility toward Rials was evident, because, when Frank attempted to have the trust set aside, John suggested that Frank and Jane meet and discuss matters. According to Jane and Rials, in so doing, John breached his duty of loyalty. In light of the facts in the record, we wholeheartedly disagree. The record does not indicate that John recommended anything but a discussion. Jane interpreted John as suggesting that Jane and Rials should voluntarily give up a portion of Rials's trust to avoid litigation. It is entirely possible that Jane's suspicions were correct, but there is no evidence that John had that conclusion in mind when he suggested a discussion. We could only arrive at that conclusion by way of conjecture and speculation. The record contains no evidence that John had such a resolution in mind. In fact, one could find that a trustee, who suggests a pre-litigation discussion, acts in a beneficiary's best interests. Under certain circumstances, such discussions could lead to a resolution outside litigation and could certainly be the best way to protect trust assets by avoiding what could be expensive litigation.
¶ 22. However, the chancellor found that John did not communicate with Jane or Rials regarding retention of an attorney to defend the trust. The chancellor also found that John argued against preservation of the trust. Though John takes issue with the chancellor's finding, a chancellor may certainly rely on his own recollection as to what transpired in the courtroom over which he or she presided. John points out that Jane hired an attorney to represent Rials, and Jane never asked John to do anything to defend Rials. That may be, but as the trustee, John was obligated "to act with due regard to his obligation as a fiduciary." Miss.Code Ann. § 91-9-107(2). John knew of Frank's lawsuit because Frank named John as a defendant, both individually and in his capacity as the trustee. The chancellor could have reasonably found that by failing to communicate with Jane and Rials, John failed to meet his statutory obligations. By extension, the chancellor could have also found that John's failure to meet those obligations was due to his conflict of interest. John claims that he followed the letter of the trust when Jane made it clear that she wanted the trust followed to the letter. However, John should have followed the trust to the letter regardless of whether Jane wanted it followed similarly.
¶ 23. Additionally, John's conflict of interest was evident due to certain events that transpired when John and his siblings distributed certain property from their mother's estate. According to the trust, Rials inherited Frank's share of Frank and John's mother's estate. Among others, John and Frank attended a family meeting during which their mother's personal possessions were divided. John did not notify Rials or Jane of that meeting. Despite the trust's language granting Rials Frank's interest in his mother's estate, Frank took possession of an oriental rug valued at approximately $4,500. John never asserted an ownership interest on Rials's behalf. What is more, when John discovered that Frank intended to sell the rug, John bought the rug from Frank. In essence, *848 the trust was divested of a $4,500 asset, and the trustee helped accomplish it.
¶ 24. Another event bears discussion. After John and Frank's mother died, John found $5,000 in bonds that belonged to his father. Pursuant to their father's will, half of his estate went to the mother, and the other half went to Frank, John, and their two brothers Jimmy and Tommy, subject to their mother's life estate.[2] Because their mother had already passed, those bonds were distributed among the four brothers. John testified that Frank's share of the value of the bonds went to Jimmy because Frank owed Jimmy money for a car and dental bills Frank had incurred in Mexico. However, those bonds passed through Frank's mother's estate, but any such proceeds arguably were an asset of the trust. John never asserted ownership of those proceeds on behalf of Rials. The chancellor could have found that a reasonably prudent trustee and fiduciary would have asserted ownership of those proceeds on behalf of the trust. It follows that the chancellor could have reasonably found that John's failure to assert ownership of those proceeds was due to John's conflicted interests. While the division of the bond proceeds was not the basis of the chancellor's reasoning or decision, it certainly highlights John's conflict of interests.
¶ 25. John points out that, but for him, there would be no trust, and Rials would not be the beneficiary of that trust. That may very well be, but John's altruistic motives in drafting the trust are called into question when viewed in light of his other testimony. John testified that Frank was arrested and charged with burglary on April 22, 1999. Without any request from Frank, John drafted the trust on April 23, 1999. Regarding his motivation for drafting the trust, John was asked, "[a]m I correct in understanding that when you learned of Frank's trouble, you anticipated a possible civil suit against Frank for money damages?" John answered, "I had anticipated a possible civil suit against Frank on other occasions, as well. . . . I did know that on [April 22, 1999,] he had broken into someone's home, and I could see the potential for civil liability there." In prior deposition testimony, John testified:
[w]ell, I felt like [Frank] was  had gotten himself into a position where he might have someone to file a suit against him, try to take his property, and I thought that this was a way to try to protect his property and our family farm, so to speak, which he would have had a 25 percent interest in it when Mama died.
During the trial that led to this appeal, John explained that in drafting the trust, he "was trying to protect [Frank's] property for his family."
¶ 26. Additional portions of John's deposition testimony reveal a less altruistic motive. John testified that he drafted the trust documents because "[he] didn't want to wind up owning 25 percent interest in some property with somebody from wherever who may have sued [Frank] and taken it." What is more, though Frank executed the trust documents on April 23, 1999, the trust document was backdated to reflect a signing date of September 14, 1998. John was asked, "[w]as the intention of that to indicate that it was not done on the eve of an event that might trigger a lawsuit, and that it was done at a prior time when that lawsuit was not perhaps being contemplated." John responded, *849 "[y]es, sir." John also testified that although the trust document reflected that Lawson Holladay drafted the trust document, Holladay had nothing to do with drafting the trust. Finally, John had notary public Jimmy Sherman notarize Frank's signature despite that Frank did not sign the trust documents in Sherman's presence.
¶ 27. John argues that if there is any hostility, it has been manufactured by Jane. John claims Jane wanted to have him removed as trustee because she wanted to control the trust assets. One could interpret certain events and find that John is correct. After John sold his mother's home, the trust suddenly acquired $49,000 in assets. Through an attorney, Jane demanded that John tender that money to her so she could place those funds in an account for Rials. Jane also prevented John from placing those funds in an interest-bearing account for approximately two years. As a result, the proceeds from the sale of the home sat in the chancery court registry and missed an opportunity to earn interest. When asked about those events during cross-examination, Jane responded that she would not allow John to invest those fund because "I ain't letting my baby's money go."
¶ 28. Encouragingly, John expressly states that he does not believe Jane would misappropriate any of the trust funds. However, the trust does not require that the trustee release funds to Jane upon her demand, and it is disheartening that the trust lost the opportunity to earn additional interest. Nonetheless, we do not affirm the chancellor's decision based on the hostility of any party. The following language set forth in Walker is noteworthy:
Disagreement and unpleasant personal relationships between the Trustee and the beneficiaries are not usually enough to warrant removal. The beneficiary often conceives that he could manage the Trust better than the Trustee, resents failure to follow his advice, is dissatisfied with returns, thinks that the Trustee is too conservative in his investment policies, and otherwise finds fault with the Trustee. Thus, friction develops. But the settlor has entrusted the management to the Trustee and not to the beneficiaries. The very fact that he has created a Trust shows that he did not want the beneficiaries to be the controlling factor in management of the property.
Walker, 531 So.2d at 804 (quoting George Bogert, Trusts, § 160 (5th ed.1973)). Where evidence shows that a guardian of a beneficiary or the actual beneficiary creates hostility as a part of a greater goal to have a trustee removed, that guardian or beneficiary will be sorely disappointed. 76 Am.Jur.2d Trusts § 235 (2007) ("A court will not sanction the creation of hostility by a beneficiary in order to effectuate the removal of a trustee.")
¶ 29. In Walker, the Mississippi Supreme Court quoted Bogert's Trusts. The following language from Bogert is persuasive:
The trustee owes a duty to the beneficiaries to administer the affairs of the trust solely in the interests of the beneficiaries, and to exclude from consideration. . . the welfare of third persons. This is called the duty of loyalty. . . . In enforcing the duty of loyalty the court is primarily interested in improving trust administration by deterring trustees from getting into positions of conflict of interests. . . .
George Bogert, Trusts, § 95 (6th ed.1987). We interpret the chancellor as having found that John was unable to "exclude from consideration . . . the welfare" of his brother, Frank. Consequently, the chancellor sought to improve trust administration *850 by removing John from a position of conflict of interest.
¶ 30. The facts of this case are somewhat peculiar. Here, we have an inter vivos irrevocable trust created pursuant to no request by the settlor-under suspicious circumstances-for a suspect purpose. The settlor later unsuccessfully attempted to have the trust set aside. Combined with fairly common family struggles and potential conflict between former spouses, it does not require great prophetic ability to see conflict on the horizon. In any event, we interpret the chancellor as having removed John due to his conflict of interest, and not due to hostility. We cannot find that the chancellor abused his discretion. Accordingly, we affirm the judgment of the chancery court.
¶ 31. THE JUDGMENT OF THE SUNFLOWER COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE AND CARLTON, JJ., CONCUR.
NOTES
[1] The Mississippi Supreme Court adopted the Mississippi Rules of Evidence effective on January 1, 1986. The Mississippi Supreme Court rendered its decision in Eidt on November 10, 1982.
[2] Tommy McWilliams predeceased his mother. Accordingly, Tommy's fourth of his mother's estate passed to his two children.