# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-CA-01468-COA

| | |
|---|---|
| NAPOLEON L. CASSIBRY, III, AS TRUSTEE OF THE N. L. CASSIBRY, JR. FAMILY TRUST, TRUSTEE OF THE CASSIBRY CHILDREN IRREVOCABLE TRUST, TRUSTEE OF THE JUNE C. CASSIBRY IRREVOCABLE TRUST, POWER OF ATTORNEY FOR JUNE C. CASSIBRY AND MANAGING PARTNER OF THE CASSIBRY BROTHERS PARTNERSHIP, NAPOLEON L. CASSIBRY, III, INDIVIDUALLY AND JOHN C. CASSIBRY, INDIVIDUALLY | APPELLANTS |

v.

| | |
|---|---|
| GRAHAM W. CASSIBRY | APPELLEE |

DATE OF JUDGMENT: 07/30/2013
TRIAL JUDGE: HON. CATHERINE FARRIS-CARTER
COURT FROM WHICH APPEALED: BOLIVAR COUNTY CHANCERY COURT, SECOND JUDICIAL DISTRICT
ATTORNEYS FOR APPELLANTS: JEFFREY A. LEVINGSTON
KAYTIE MICHELLE PICKETT
ATTORNEY FOR APPELLEE: STEVEN TODD JEFFREYS
NATURE OF THE CASE: CIVIL - WILLS, TRUSTS, AND ESTATES
TRIAL COURT DISPOSITION: APPELLANT NAPOLEON CASSIBRY ORDERED TO PAY A JUDGMENT OF $144,865.86, PLUS POST-JUDGMENT INTEREST OF EIGHT PERCENT PER ANNUM, TO APPELLEE; TO PAY $17,902 IN COSTS; TO PAY APPELLEE $28,500 IN ATTORNEY'S FEES; AND TO TRANSFER 7,757 SHARES OF STOCK TO APPELLEE
DISPOSITION: AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 01/24/2017
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE LEE, C.J., BARNES AND ISHEE, JJ.

**BARNES, J., FOR THE COURT:**

¶1.     This appeal results from the Bolivar County Chancery Court's findings that Napoleon Cassibry III, as the Trustee of three separate irrevocable trusts, breached a duty of loyalty and a fiduciary duty to one of the trusts' beneficiaries, Graham Cassibry, and was liable for damages, costs, and attorney's fees. Napoleon argues that, as to two of the trusts, the chancery court erred in finding that he breached the duty of loyalty, and the damages awarded should be reduced. He also contends the court erred in awarding Graham attorney's fees.[1]

¶2.     On review, we affirm the chancery court's award of damages. However, as the attorney's fees itemization was not properly admitted into the chancery court's record, we reverse and remand for a hearing on the issue of attorney's fees.

## SUMMARY OF FACTS

### 1.     The Family Trust

¶3.     The patriarch of the Cassibry family, Napoleon Cassibry Jr., died on July 21, 1998, leaving an estate of $1,225,064. He was survived by his wife, June Cassibry; three sons: Napoleon, Graham, and John Cassibry; and their issue. Per the terms of his will, the Napoleon LePoint Cassibry Jr. Family Trust (Family Trust) was established, and his eldest son, Napoleon, was appointed as Trustee. The trust was initially valued at approximately $300,000, consisting of 2,789 shares of Mr. Cassibry's stock in Cleveland State Bank (CSB) (valued at $93 per share), and a one-half interest in the marital home, which was valued at $75,000. By June 2004, the Family Trust owned 5,558 shares of CSB stock and 7,500 shares

---

[1] Although John Cassibry is listed as a co-appellant, he did not participate in the litigation below and has not filed an appellant's brief.

of Covenant Bank stock. While the Family Trust was established "for the principal benefit" of June "for her lifetime," the Trustee was authorized "in his discretion to pay to or for the benefit of my children and/or their issue any such withheld income deemed advisable for their maintenance, health and education (including post[-]graduate education)." The Trustee was also authorized to "sprinkle income to other beneficiaries," after first looking to June's "maintenance and health." Upon June's death, the Trustee was to transfer any remaining trust property in equal shares to the three sons.

¶4. From May 2003 to January 2008, it is undisputed that Napoleon withdrew at least $55,325 in funds from the Family Trust, which he characterized as "loans."[2] He claimed that June authorized the withdrawals. Napoleon also disbursed funds from the account for his daughters' expenses. In 2004, Napoleon pledged the Family Trust's stock holdings as collateral for a $200,000 CSB loan to buy stock in Paragon National Bank (Paragon).[3] Because of a loss in stock value due to the economic climate, the pledged stock had to be sold in 2007 to repay the loan debt.

### 2. The Children's Trust

¶5. On February 23, 1999, June formed the Cassibry Children Irrevocable Trust (Children's Trust), with Napoleon appointed as Trustee. The trust was funded with 5,563 of June's shares of CSB stock, which were collectively valued at approximately $517,000, and the beneficiaries were Napoleon, John, and Graham. The purpose of the trust was to

---

[2] No loan documentation was recorded for these withdrawals, and there is no indication that he paid any interest or pledged any collateral or security for the "loans."

[3] The Paragon transaction will be discussed in more detail below.

avoid estate gift tax and to protect the assets from pending lawsuits involving John's ex-wives. Although the agreement required the Trustee to "divide the Trust Principal into equal shares to create one Trust for each of the Grantor's children[,]" with "[e]ach share [to] be administered separately,"[4] the trust was at all times managed as one corpus.

¶6.    Under article 4.2(a)(1) of the Children's Trust agreement, Napoleon was vested with broad discretion to "pay to or for the benefit of the beneficiary any amount of the income along with any amount of principal from the Trust as the Trustee deems advisable for the health, education, maintenance, support and comfort of such beneficiary." Article 5.6 stated that "[i]f there is insufficient cash to satisfy the withdrawal demand of a beneficiary, Trustee either may make a distribution in kind, or raise cash through a sale or borrowing, to satisfy the demand." Furthermore, upon written request to the Trustee, each beneficiary could withdraw up to $10,000 within thirty days of the trust's creation or within thirty days after additional contributions to the trust had been made "during any calendar year." However, Napoleon withdrew funds in excess of the trust's annual withdrawal provisions. He also pledged the trust's entire 5,563 shares of CSB stock as collateral for a $200,000 loan to buy Paragon stock, which he was authorized to do under the trust's terms.

### 3.    The JCC Trust

¶7.    On February 28, 2000, June established the June C. Cassibry Irrevocable Trust (JCC Trust), with Napoleon as Trustee, and the three brothers as beneficiaries. The sole purpose of this trust was to receive life-insurance proceeds upon June's death. After expenses of the

---

[4] At the time of the trust's creation, each beneficiary's share would have been 1,854 shares of stock valued at approximately $172,500.

4

estate were paid, the beneficiaries were to receive the remaining proceeds in equal shares.

### 4.   The Paragon Transaction

¶8.   In 2004, Napoleon had the opportunity to purchase 40,000 shares of Paragon stock at $10 per share as an investment.  He purchased 20,000 shares in his own name, and the other 20,000 shares were held by a shell partnership, Cassibry Brothers Partnership (CBP).[5] Graham refused to participate in the Paragon venture; so Napoleon and John were the only CBP partners.  As the chancery court noted in its findings, although the shares were held by Napoleon and CBP, there was a stock-collateralization agreement that stated actual ownership of the stock was "roughly" as follows: the Family Trust and CBP collectively owned seventy-five percent (75%), while Napoleon's two daughters owned twenty-five percent (25%).[6]

¶9.   To purchase the shares, Napoleon used a personal $200,000 line of credit at CSB, as well as a Family Trust CSB $200,000 line of credit.  The lines of credit were secured by the following collateral:  5,563 CSB shares associated with the Children's Trust; 5,558 shares of CSB stock held by the Family Trust; 7,500 shares of Covenant Bank stock held by the Family Trust; and the life-insurance policy associated with the JCC Trust.  The record reflects that, on October 22, 2004, Napoleon withdrew $190,000 from the Family Trust Union Planters (UP) checking account. The chancellor noted that $40,000 of that withdrawal

---

[5] The reasoning for structuring the transaction this way was because, as an organizing director and chairman of the board for Paragon, a startup bank, "[Napoleon] got a favorable deal on warrants and options."

[6] The agreement was signed by Napoleon, John, June, and one of Napoleon's daughters.

was deposited into what the record suggests were Napoleon's personal accounts. Napoleon claims that money also went to purchase the Paragon stock, but there is no documentation to that regard.

¶10.   Unfortunately, the value of the Paragon stock plummeted in 2007 due to economic conditions.[7]   The loans used to purchase the stock were in default; so the trusts' stock holdings were under threat of being sold at auction.  To satisfy the debt, Napoleon found a purchaser for the CSB stock.  However, since Graham never agreed to participate in the Paragon stock purchase, Napoleon and John distributed to Graham one-third of the Children's Trust CSB stock.

¶11.   Napoleon also sold June's home, and Graham purchased her a condominium with the real-estate proceeds.  June died in 2008, and $401,559.26 was paid into the JCC Trust. Napoleon used the assets to pay off debts and liabilities associated with the Paragon transaction, even though the trust's terms did not authorize such expenditures.

### SUMMARY OF PROCEDURAL HISTORY

¶12.   On June 19, 2009, Graham filed a complaint against Napoleon, as Trustee and individually, and his brother, John, alleging that Napoleon breached his fiduciary duty in relation to the three trusts.[8]   Graham claimed that Napoleon had "misappropriated his mother's, the trusts' and/or partnership assets for his own use," and pledged those assets in order to borrow money personally and/or purchase stock "from which he benefitted both

---

[7] At the time of the trial proceedings, the value of the stock was $2 per share.

[8] As already noted, John did not participate in any of the litigation.

6

directly and indirectly." Graham also asserted that Napoleon, as his mother's attorney-in-fact, had withdrawn monies from June's IRA and pension accounts for Napoleon's personal or family use, rendering June "virtually penniless" at the time of her death on December 21, 2008. Graham requested that Napoleon be removed as trustee and a constructive trust be established. Napoleon responded that "all transactions related to any of the Trusts were done with the knowledge and acquiescence" of Graham and John, and that "all said transactions were reasonable, warranted and justified under the circumstances then existing." He further argued that any losses resulting from his investment of trust assets, i.e., the Paragon stock, were attributable to the economy.

¶13.    On August 20, 2009, the chancery court preliminarily ordered Napoleon to deposit $239,299.60 related to the JCC Trust into the court registry. An accounting was ordered by the chancery court on August 5, 2010. After meeting with the parties and their attorneys over the next few months, the accountant, Danny Barfield, CPA, rendered his findings on December 29, 2010. The accounting report noted discrepancies in the accounting provided by Napoleon and the accountant's findings. The accountant determined that Napoleon had withdrawn a total of $426,373.46 "as a beneficiary of his mother and father's estate." The items charged to John as a beneficiary totaled $155,371.71. As no items were charged to Graham "from the estates or life[-]insurance proceeds," the accountant concluded that Graham was due $155, 317.71 from the life-insurance proceeds to "even him up with John" and that the remaining $70,578.71 from the life-insurance proceeds was "to be divided evenly" between John and Graham. He further concluded that Napoleon owed John and

7

Graham $78,588.85 each.

¶14.    Months later, Napoleon filed a motion in limine on September 27, 2011, seeking to exclude Barfield's accounting report and to strike Barfield from testifying regarding his findings.  At the motion hearing on December 6, 2011, Barfield testified that he had reviewed bank statements on "six or seven bank accounts from 1999 until 2010," noting the documentation he received was "very disorganized[, v]ery convoluted, mixed up, thrown about."  He said Napoleon had provided accountings that were "somewhat helpful in that there were checks that he had written to himself or for his personal benefit," which Barfield "charged" to him.  Barfield determined that there should have been $807,587.29 in the estate or trust had the withdrawals not been made.  Dividing that number by three, he calculated that each heir would be entitled to $269,195.76 "if those personal withdrawals had not been made to the benefit of Napo[leon] and John[,] and if the two general partners and the partnership repaid the loans from the insurance trust and the estate."  Therefore, he concluded Napoleon had withdrawn $157,177.70 ($426,373.46 - $269,195.76) more than he was entitled; divided that figure by two; and determined that Napoleon owed John and Graham $78,588.85 each.  Napoleon did not contest Barfield's characterization of the transactions during their meetings.  When Napoleon's counsel questioned Barfield as to why he did not do a more detailed reconciled accounting, Barfield stated that he had told counsel in a previous meeting he was not going to "burn up two hundred thousand dollars doing useless work[.]"[9]

---

[9] Likely referring to the amount deposited into the registry of the court ($239,299.60).

¶15. Noting the accountant was "agreed upon by the parties," and the issues cited by Napoleon were brought several months after the issuance of Barfield's report, the chancellor denied Napoleon's motion in limine and accepted the report "as a working document for information purposes." She did clarify that whether something was classified as a loan or investment would be determined by the court, not Barfield. Graham's motion to establish a constructive trust was also denied, as the court found that the assets of the trusts had essentially been depleted.

¶16. After a bench trial, the chancery court entered its findings of fact on May 17, 2013. Although the chancellor determined that Napoleon's investment decisions concerning Paragon were not a breach of fiduciary duty, since no one could have predicted the economic downturn, she did conclude that Napoleon had a duty of loyalty as Trustee, and his cash withdrawals and loans for his own benefit from the three trusts were a "blatant example of breach of fiduciary duty." The chancellor held: "[Napoleon] took advantage of the situation and used the trusts as his own personal accounts. He made withdrawal after withdrawal that served only him and did nothing for the other beneficiaries. . . . These withdrawals depleted the trusts and proximately caused injury to the other beneficiaries." The chancellor also determined that Graham was entitled to 7,757 of the Paragon shares, as a beneficiary of the Family Trust. The chancery court, however, rejected Graham's remaining claims and Napoleon's counterclaim, and denied Graham's request for an award of attorney's fees. In the final judgment entered on May 28, 2013, the chancery court awarded Graham and John the remaining JCC Trust insurance proceeds on deposit with the chancery clerk, with each

9

receiving $109,190.07. Furthermore, Napoleon was ordered to pay Graham an additional money judgment of $143,665.86, "plus post-judgment interest in the amount of eight percent (8%) per annum from the date of the judgment."[10]

¶17. Both parties filed Mississippi Rule of Civil Procedure 59 motions to alter or amend the judgment. Napoleon argued the chancery court should have allowed him credit for certain deposits made into the trusts, totaling $112,887.65. Attached to the motion was a document created by Napoleon containing dates and amounts. Graham cited several issues in his motion for reconsideration, including requests that the transfer of Paragon shares be addressed in the final judgment and that he be awarded attorney's fees. On July 30, 2013, the chancery court issued supplemental findings. She denied Napoleon's request to be given credit for the deposits, noting the accountant had listed the designated deposits as "Misc./Unexplained," and Napoleon knew since December 2010 that he had not been given credit for "these mysterious deposits." The chancellor concluded that "it remain[ed] unclear where those funds originated." The court did amend the judgment, however, awarding Graham $28,500 in attorney's fees, in addition to $144,865.86 in monetary damages.[11] Napoleon was also ordered to pay $17,902 in costs (for the accounting), and to transfer 7,757 shares of Paragon National Bank stock to Graham.

---

[10] The chancery court arrived at this judgment amount by awarding Graham $135,045 (one-half of Napoleon's cash withdrawals from the Family Trust and Children's Trust), and $8,620.86 for the deficit left on the insurance money related to the JCC Trust.

[11] The $1,200 increase in Graham's original judgment award was attributable to an additional payment made to a bank related to the JCC Trust, which the chancery court determined was paid without permission, and Napoleon "had no authority to use the insurance money to pay that debt."

¶18.   Napoleon brings three arguments on appeal: (1) the chancellor erred in finding his "loans" from the Children's Trust constituted a breach of the duty of loyalty; (2) the chancellor erred in awarding damages for the Family Trust, as he had June's "express knowledge and consent" to make the withdrawals; and (3) there was no credible evidence to support the award of attorney's fees to Graham. Napoleon does not appeal the award of funds to Graham and John related to the JCC Trust, the award of the costs for the accountant, or the transfer of Paragon stock to Graham. He requests that this Court reverse the damage award related to the Family Trust and Children's Trust ($135,045) and the award of attorney's fees, and render a judgment of $9,820.86 in damages ( JCC Trust) and $17,902 in costs. Alternatively, he argues that a remand on the issue of attorney's fees is warranted.

¶19.   Finding substantial evidence supports the chancery court's findings related to the Children's Trust and the Family Trust, we affirm the judgment in part. We reverse and remand on the issue of attorney's fees, however, as Graham admits that the itemization of charges for attorney's fees was not properly contained in the record.

<strong>STANDARD OF REVIEW</strong>

¶20.   "Factual findings made by the chancery court will not be disturbed if they are supported by substantial evidence unless we can say with reasonable certainty that the chancellor abused his discretion, was manifestly wrong or clearly erroneous, or applied an erroneous legal standard." *Robinson v. Trustmark Nat'l Bank*, 179 So. 3d 1146, 1148 (¶9) (Miss. Ct. App. 2015) (quoting *Finch v. Finch,* 137 So. 3d 227, 232 (¶10) (Miss. 2014)).

<strong>DISCUSSION</strong>

**I.** **Whether the chancellor erred in finding Napoleon's withdrawals or "loans" from the Children's Trust constituted a breach of the duty of loyalty.**

    *A.* *Whether it is a breach of the duty of loyalty under Mississippi Code Annotated section 91-8-802(b)(1) (Supp. 2014) for the trustee to make loans to himself as beneficiary.*

¶21.    Napoleon contends the chancellor applied an erroneous legal standard in finding that Napoleon's "loans"[12] from the Children's Trust constituted a breach of the duty of loyalty. Under the terms of the trust agreement, the Trustee was authorized to "make loans, secured or unsecured, with interest or without, to the executor of the estate of the Grantor, *or to a beneficiary*, and shall be without liability for a loss resulting therefrom." (Emphasis added). Since he was a beneficiary, Napoleon argues: "[T]he [c]hancellor imposed upon [him] a duty to refrain from doing what the Children's Trust authorized him to do." He cites Mississippi Code Annotated section 91-8-802(b)(1)," which provides in part:

    (b)    [A] sale, encumbrance, or other transaction involving the investment or management of trust property entered into by the trustee for the trustee's own personal account or which is otherwise affected by a conflict between the trustee's fiduciary and personal interests is voidable by a beneficiary affected by the transaction unless:

    (1) The transaction was authorized by the terms of the trust[.]

¶22.    However, section 91-8-802 was not enacted until 2014, after the chancery court entered its amended final judgment.[13] Graham argues that the statute cannot be applied

---

[12] We note there is no actual loan documentation or agreements in the record concerning these withdrawals of funds.

[13] In 2014, the Mississippi legislature enacted the Mississippi Uniform Trust Code. *See* Miss. Code Ann. §§ 91-8-801 to -1206 (Supp. 2014).

retroactively to any acts made by Napoleon prior to that date. Napoleon responds that

Mississippi Code Annotated section 91-8-1106 (Supp. 2014) renders the statute retroactive

and, thus, applicable to the Children's Trust agreement, citing specifically subsections (a)(1)

and (a)(3). Section 91-8-1106 provides in full:

> (a) Except as otherwise provided in this chapter:
>
> > (1) This chapter applies to *all trusts created before, on, or after July 1, 2014*;
> >
> > (2) This chapter applies to all judicial proceedings concerning trusts commenced on or after July 1, 2014;
> >
> > (3) This chapter applies to judicial proceedings concerning *trusts commenced before July 1, 2014*, unless the court finds that *application of a particular provision of this chapter would substantially interfere with the effective conduct of the judicial proceedings or prejudice the rights of the parties*, in which case the particular provision of this chapter does not apply and the superseded law applies;
> >
> > (4) Any rule of construction or presumption provided in this chapter applies to trust instruments executed before July 1, 2014, unless there is a clear indication of a contrary intent in the terms of the trust; and
> >
> > (5) *An act done before July 1, 2014, is not affected by this chapter.*
>
> (b) If a right is acquired, extinguished, or barred upon the expiration of a prescribed period that has commenced to run under any other statute before July 1, 2014, that statute continues to apply to the right even if it has been repealed or superseded.

(Emphasis added). Upon review, since the statute was not enacted until after the chancery

court rendered its decision, applicability of the new statute would "substantially interfere

with the effective conduct of the judicial proceedings" under subsection (a)(3). Further,

13

subsection (a)(5) is applicable to Napoleon's actions taken before July 1, 2014. This provision is discussed in the comments to the Model Uniform Trust Code (Rev. 2010), which states:

> The Uniform Trust Code is intended to have the widest possible effect within constitutional limitations. Specifically, the Code applies to all trusts whenever created, to judicial proceedings concerning trusts commenced on or after its effective date, and unless the court otherwise orders, to judicial proceedings in progress on the effective date. In addition, any rules of construction or presumption provided in the Code apply to preexisting trusts unless there is a clear indication of a contrary intent in the trust's terms. By applying the Code to preexisting trusts, the need to know two bodies of law will quickly lessen.
>
> This Code cannot be fully retroactive, however. . . . [R]ights already barred by a statute of limitation or rule under former law are not revived by a possibly longer statute or more liberal rule under this Code. *Nor is an act done before the effective date of the Code affected by the Code's enactment.*

(Emphasis added). Napoleon's withdrawals are "act[s] done before July 1, 2014," and are not "affected by the Code's enactment."

¶23. In its findings of fact, the chancery court relied on common-law principles, citing the Restatement (Third) of Trusts § 78, which provides that "a trustee has a duty to administer the trust solely in the interest of the beneficiaries[,] . . . [and] except in discrete circumstances, the trustee is strictly prohibited from engaging in transactions that involve self-dealing or that otherwise involve or create a conflict between the trustee's fiduciary duties and personal interests." In *McWilliams v. McWilliams ex rel. Weathersby*, 994 So. 2d 841, 849 (¶29) (Miss. Ct. App. 2008), we observed:

> The trustee owes a duty to the beneficiaries to administer the affairs of the trust solely in the interests of the beneficiaries . . . . This is called the duty of loyalty. . . . In enforcing the duty of loyalty the court is primarily interested in improving trust administration by deterring trustees from getting into positions

14

of conflict of interests.

(Quoting George Bogert, *Trusts* § 95 (6th ed. 1987)). This duty of loyalty has been codified in Mississippi Code Annotated section 91-9-609 (Supp. 2014), which states: "A trustee shall invest and manage the trust assets solely in the interest of the beneficiaries."[14]

¶24. Even if the recently codified exception to the duty of loyalty applied, as argued by Napoleon, it would not permit a trustee to disregard completely his duties as a fiduciary. The Court of Appeals of Michigan, addressing its identically worded statute regarding a trustee's duty of loyalty in Michigan Compiled Laws Annotated 700.7802(1) and (2) (Rev. 2010), determined: "While the trust granted [the] appellant the power as trustee to make transfers of trust property, it did not grant her the right to engage in self-dealing." *In re Beverly J. LaForest Living Tr.*, No. 323296, 2016 WL 56875, at *2 (Mich. Ct. App. Jan. 5, 2016).

> Even an express authorization of this type . . . would not completely dispense with the trustee's underlying fiduciary obligations to act in the interest of the beneficiaries and to exercise prudence in administering the trust. *Accordingly, no matter how broad the provisions of a trust may be in conferring power to engage in self-dealing or other transactions involving a conflict of fiduciary and personal interests, a trustee violates the duty of loyalty to the beneficiaries by acting in bad faith or unfairly.*

*Mennen v. Wilmington Trust Co.*, No. CV 8432 ML, 2015 WL 1914599, at *25 (Del. Ch. Apr. 24, 2015) (emphasis added) (quoting Restatement (Third) of Trusts § 78 (2007)).

¶25. We find no merit to Napoleon's claim that the chancellor erroneously applied the duty of loyalty.

> B.     *Whether the chancellor's finding that Napoleon's withdrawals from the Children's Trust "depleted the*

---

[14] Section 91-6-609 was enacted on July 1, 2006.

> *trusts and proximately caused injury to the other beneficiaries" is manifestly wrong.*

¶26. Napoleon does not deny he withdrew a significant amount of funds from the Children's Trust. He merely argues the chancellor's holding is "manifestly wrong," as the trust agreement authorized him to make the withdrawals or "loans," and he "depleted only his own share and John's share," leaving Graham to receive his share "free and clear." As Napoleon acknowledges, "each child only had access to his individual gift by borrowing against it," which is what he claims that he did under the express authority of the trust agreement's terms. He avers that he only took $159,493.28 in "loans" from the Children's Trust from 1999 to 2007, noting his individual share of the trust's corpus "was roughly $172,453."

¶27. Therefore, he contends that since there was no evidence of any injury suffered by Graham as a result of Napoleon's "loans to himself," there was no breach of fiduciary duty. "In other words, there was no testimony or evidence whatsoever demonstrating that the value of Graham's share of the Children's Trust was impaired by Napoleon's loans against his share." There is no dispute that Napoleon was authorized to make loans to himself as a beneficiary under the terms of the trust; nor does Graham argue that Napoleon took more than his one-third share. Rather, Graham asserts Napoleon breached his fiduciary duty with the "thousands of dollars poured into the Children's Trust accounts and thousands of dollars poured directly into Napo[leon] and his family's pockets," Napoleon violated the trust's "annual withdrawal limits," and he failed to provide a proper accounting "as required by the trust."

16

¶28. The chancellor found that Napoleon's withdrawals of funds were a "blatant example of a breach of fiduciary duty." The record fully supports this finding. Even express authorization to engage in transactions otherwise prohibited under a trustee's duty of loyalty does not "completely dispense with the trustee's underlying fiduciary obligations to act in the interest of the beneficiaries and to exercise prudence in administering the trust." Restatement (Third) of Trusts § 78 cmt. c(2) (2007). As this Court explained in *Wilbourn v. Wilbourn*, 106 So. 3d 360, 371 (¶35) (Miss. Ct. App. 2012):

> "A trustee has a duty to act with due regard to his obligation as a fiduciary." Miss. Code Ann. § 91-9-107(2) (Supp. 2011). A "fiduciary" is "required to act for the benefit of another person on all matters within the scope of their relationship," owing "the duties of good faith, trust, confidence, and candor." Black's Law Dictionary 658 (8th ed. 2004). "The touchstone of the fiduciary relationship between the trustee and his beneficiaries is loyalty." Jeffrey Jackson & Mary Miller, Encyclopedia of Mississippi Law § 73:8 (2001). . . . "The interests of the beneficiaries are paramount, and nothing should be done that would diminish their rights under the terms of the agreement and granted by law. One in a fiduciary position, such as a trustee, cannot take advantage of that position of trust in administering the assets entrusted to him or her." *Id.*

Instead of "act[ing] with due regard to his obligation as a fiduciary," Napoleon clearly violated the terms of the trust agreement. Article 5.1 of the Children's Trust agreement provided in part:

> Subject to the limitations of Article 5.2, upon a contribution to the Trust of cash or property, each beneficiary . . . shall have the right to withdraw the first Ten Thousand Dollars ($10,000.00) (or Twenty Thousand Dollars ($20,000) for split gifts made by husband and wife) of property contributed to the Trust during any calendar year.

The agreement further noted that any exercise of the right of withdrawal was to be submitted in writing, was "not cumulative," and "lapse[d] in full if it [was] not exercised" within the

17

stated time limitations. Napoleon acknowledged that he withdrew approximately $42,000 in 1999 alone and estimated that he withdrew $107,050 from the CSB Children's Trust checking account from January 2003 to November 2007.[15] The chancellor determined that Napoleon breached his duty of loyalty as Trustee and "took advantage of the situation and used the trusts as his own personal accounts, . . ma[king] withdrawal after withdrawal that served only him and did nothing for the other beneficiaries." He was only authorized to withdraw $10,000 in 1999; therefore, his total withdrawal of approximately $42,000 was not authorized by the trust. The maximum amount that Napoleon could have withdrawn from the trust from 2003 to 2007 was $50,000; yet he withdrew more than double that amount. Furthermore, he had no recollection of the purpose of the withdrawals or "loans," as he terms them. When asked by plaintiff's counsel if he had been in a "financial bind" that required him to make the cash withdrawals, he stated: "I really don't recall."

¶29. Napoleon also failed to provide an annual "statement of each receipt and disbursement" to each beneficiary, as required under the trust agreement. Napoleon admitted at trial that he only provided "annual accounts in the form of a balance sheet" when one was requested. Barfield, the accountant who reviewed the bank statements for the "six or seven bank accounts from 1999 to 2010," had to submit several inquiries as to whom monies had been paid and what the sources of several deposits were. Barfield testified:

> [T]he records were a mess, and it took us months to get the bank statements to where we could make some sense from them, and he is an ex-banker.

---

[15] Another account was later established at UP for the Children's Trust. Napoleon's estimated withdrawals from the UP account during this period were $52,443.28.

And when I saw the accounting, I was frankly surprised that a man with his background in accounting would have such a mess as far as records on a family trust and an estate.

The chancellor also noted in her findings that "when asked to produce records, [Napoleon] came forward with a jumbled mess of documents."

¶30.    "A trustee has a duty to maintain clear, complete, and accurate books and records regarding the trust property and the administration of the trust, and, at reasonable intervals on request, to provide beneficiaries with reports or accountings."  Restatement (Third) of Trusts § 83 (2007).  Moreover, "[a] trustee who fails to keep proper records is liable for any loss or expense resulting from that failure," and the "failure to maintain necessary books and records may also cause a court in reviewing a judicial accounting to resolve doubts against the trustee."  *Id*. at cmt. a(1).  As the chancery court observed, with Napoleon's extensive banking and financial-services expertise, he should have understood "the importance of good recordkeeping, . . . [but instead,] it took a lawsuit, discovery, and a court-ordered accounting to get even the slightest grasp on what [Napoleon] had been doing to these trusts."

¶31.    Therefore, we find no error in the chancellor's finding that Napoleon breached his duty of loyalty as a fiduciary. While Graham received his one-third share of the original Children's Trust corpus, we cannot agree that he suffered no damages as a result of Napoleon's breach of loyalty.  For example, the dividends earned on his shares from 1999 to 2007 were not reinvested for Graham's benefit; they were put into the trust's bank account and withdrawn by Napoleon for his personal use.

¶32.    In fashioning a remedy for Napoleon's breach of loyalty, the chancery court examined

19

Barfield's accounting, "picked out the cash withdrawals from the trusts' bank accounts made by [Napoleon] that were not associated with the Paragon transaction," and arrived at a total of $230,090.03.[16] Although the chancellor found no breach of duty related to the Paragon investment, the $40,000 Napoleon deposited into his personal account from the $200,000 CSB loan was then added to this figure, "for a total of $270,790.03," since there was no documentation to show "what happened to that money." The chancellor determined that "[i]n effect, [Napoleon] owes Graham and John $135,045 each [(one-half of $270,090)]." We find the damages award was within the discretion afforded the court, particularly as it is apparent the chancellor took great efforts to make sense of the convoluted figures and various accounts involved with both the Children's Trust and the Family Trusts.[17]

¶33. Accordingly, we affirm the chancellor's findings on this issue.

## II. Whether the chancery court erred in awarding damages for Napoleon's withdrawals from the Family Trust.

¶34. Although Napoleon disputes the accountant's findings regarding the precise amount that he withdrew from the Family Trust, this is not at issue on appeal.[18] Rather, he contends

---

[16] The chancellor, therefore, did not adopt Barfield's accounting "wholesale," as "it d[id] not fully comport with the [c]ourt's findings[,]" but stated that she would not "continue to waste time and money by requiring Mr. Barfield to rework his numbers." The court also did not count any withdrawals from June's personal accounts or any transactions between the Cassibry Brothers account and Napoleon's personal account.

[17] Napoleon has requested that this Court render judgment for $9,820.86 in damages related to the JCC Trust, and only contests the chancellor's finding that he breached a duty of loyalty. He has raised no issue regarding the chancellor's actual calculation of damages once a breach of loyalty is found.

[18] Barfield's report stated that from May 2003 to January 2008, Napoleon withdrew $73,689; Napoleon argues that he withdrew only $55,325.

20

that, as a whole, "the withdrawals from the Family Trust should not be charged against him," as there was "undisputed evidence . . . that June gave permission for each of these withdrawals."

¶35. The only evidence to support Napoleon's claim is his own testimony that he "[had] discussions with [his] mom about her business, and about things she wanted done through the trust, and she directed that in conversations that I had with her."[19]  Although Graham was not provided an opportunity to respond to this testimony, he had testified that he and John were made executors of June's will, because "she didn't trust [Napoleon] anymore." Graham also argues on appeal that his mother never worked outside the home and had relied on her husband to pay the bills when he was alive.  The chancellor pointedly asked when Napoleon was granted power of attorney over his mother, and it was noted that his power of attorney was executed approximately the same time as his father's will was probated.

¶36. Napoleon also admitted that his mother "was very tentative about giving her bank stock away, because she felt a very personal relationship with it," which is why the Children's Trust had been established – to protect her assets.  Yet he pledged those same assets to obtain a loan for a business venture.  Napoleon likewise donated, allegedly with June's acquiescence, approximately $13,000 to a nonprofit jazz foundation in Memphis from the Family Trust account; however, he acknowledged that he was a "co-organizer" for the

---

[19] Napoleon also cites section 91-8-802 to support his claim, which we have already found to be inapplicable to the acts occurring prior to the statute's enactment in 2014.

21

foundation.[20] There is, again, a question as to where Napoleon's loyalty lay – in this instance, to the Family Trust or to the foundation.

¶37.   While we acknowledge the chancery court did not make any specific findings as to whether June expressly authorized Napoleon's withdrawals from the Family Trust, we observe that "if the chancellor has made no specific findings[,] and none are required under a 'factor test' mandated by case law, we generally proceed on the assumption that [s]he resolved fact issues in favor of the prevailing parties." *Locklear v. Sellers*, 126 So. 3d 978, 981 (¶6) (Miss. Ct. App. 2013) (citing *Ferrara v. Walters,* 919 So. 2d 876, 881 (¶8) (Miss. 2005)).   The chancery court could well have disbelieved Napoleon's testimony that his mother approved withdrawals from the Family Trust, or believed that if she did agree, Napoleon had not thoroughly advised her of the consequences of the withdrawals, such as having to sell her home in 2007.  According to Graham, when the home was sold in 2007, the majority of the real-estate proceeds had to be used to pay two mortgages on the house, totaling $270,000 – mortgages that were not on the house when his father died in 1998.[21]

¶38.   We, therefore, find no merit to the argument that the chancery court had to conclude that June approved of Napoleon's withdrawals.

### III.   Whether the chancellor's award of attorney's fees was supported by the evidence.

---

[20] While Graham admitted he saw a "picture" regarding the jazz foundation on his mother's refrigerator, he stated that he received no benefit from the foundation and would not have approved of the donation.

[21] Graham acknowledged Family Trust funds were used to pay the mortgage payments on a condo he purchased for June, but he lamented the sale of his parents' home, as it "had been in the family for nearly a hundred years."

¶39.   Napoleon appeals the chancellor's award of attorney's fees, which were granted in response to Graham's motion to amend the judgment.  Although Graham maintains there is evidence to support an award of attorney's fees, he acknowledges the attorney's fee itemization was not properly admitted into the chancery court's record.  Therefore, we reverse and remand for a hearing on the award of attorney's fees.

¶40.   **THE JUDGMENT OF THE CHANCERY COURT OF BOLIVAR COUNTY, SECOND JUDICIAL DISTRICT, IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.  ALL COSTS OF THIS APPEAL ARE ASSESSED ONE-HALF TO THE APPELLANTS AND ONE-HALF TO THE APPELLEE.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, CARLTON, FAIR AND GREENLEE, JJ., CONCUR.  WILSON, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.  WESTBROOKS, J., NOT PARTICIPATING.**