# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-01343-COA

IN RE NAME CHANGE: PETITIONER                                    APPELLANT
YASMINE MONTIA JONES, BY AND
THROUGH HER GUARDIAN AND
CONSERVATOR, JOHN D. K. TAYLOR

| | |
|---|---|
| DATE OF JUDGMENT: | 11/14/2023 |
| TRIAL JUDGE: | HON. J. DEWAYNE THOMAS |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | LINDSEY OSWALT WATSON CHARLES R. WILBANKS JR. |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED, RENDERED, AND REMANDED - 04/01/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., McDONALD AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1. The uncle of an adult woman with disabilities became her court-appointed guardian after the death of her mother. The guardian petitioned on the woman's behalf to have her last name changed to her mother's maiden name. At the time, she still carried the surname of her mother's ex-husband—who had been disestablished as her biological father via DNA testing. Although the guardian argued it would be in the woman's best interest to change her name, the chancery court declined.

¶2. The guardian appeals, asserting the woman would have made the decision to request a name change if she had the capacity. Because the trial court improperly substituted its judgment for that of the guardian without sufficient evidentiary support to do so, we reverse,

render, and remand.

## BACKGROUND

¶3.     Yasmine Jones is an adult with special needs. She has been diagnosed with autism spectrum disorder, schizophrenia, and Graves disease, and has other challenges. Even though she is of adult age, Yasmine functions at only a fourth-grade or fifth-grade level. She currently lives in a supervised apartment at Willowood Development Center, which her guardian explained is a facility that "provides services to children and adults with disabilities, including day programming, residential and employment assistance."

¶4.     Yasmine was born in 1993. At the time, her mother, Tracey Taylor, was married to Michael Earl Jones. As a result, Yasmine's birth certificate lists Tracey as her mother and Michael as her father. In 2009, Tracey and Michael divorced, and he was ordered to pay child support for Yasmine.

¶5.     The Department of Human Services subsequently filed a petition for contempt against Michael for failure to pay child support for Yasmine. Michael deployed a novel defense and denied that he was Yasmine's father, seeking to avoid the child support payments. He requested a paternity test. The results of the DNA test revealed he was not Yasmine's biological father. Consequently, the chancery court terminated Michael's child support obligations related to Yasmine.

¶6.     For the next decade, Tracey was Yasmine's primary caregiver, and Michael was not involved in her life at all. In early 2022, Tracey passed away.

2

## PROCEDURAL HISTORY

¶7.    Tracey's will included a provision designating the appointment of a guardian and conservator for Yasmine. Tracey named Yasmine's uncle, John D.K. Taylor (Tracey's brother), as guardian and conservator. Her will also specifically stated that Michael should not be appointed as conservator for Yasmine.

¶8.    However, shortly after Tracey's death, Michael filed a petition to be appointed as her guardian—in contradiction to the steps his previously took to legally sever his ties to Yasmine. In accord with Tracey's will, John filed a petition to be appointed as Yasmine's guardian.

¶9.    The chancery court conducted an evidentiary hearing on the competing petitions. Yasmine was physically present at the courthouse for the duration of the hearing, but she remained in the hallway and did not enter the courtroom or give testimony. The chancery court ultimately entered an order appointing Yasmine's uncle John as her guardian.

¶10.    Afterward, and on her behalf, John sought to change Yasmine's last name. The petition requested a change from Jones to Taylor, her mother's maiden name. The petition also asked for Michael Jones's name to be removed from Yasmine's birth certificate based on the paternity test results.

¶11.    The chancery court conducted a hearing on the name-change petition. Michael appeared at the hearing. John's attorney presented the petition and some initial background facts. The chancellor then asked Michael, "And y'all object to this?" Michael responded,

3

"Yes, I do."

¶12.   When asked why he was requesting the name change, John testified,

> This is something that should have happened by my sister when the paternity of the child was determined, but was not done. In our care plan we have a plan to establish a special needs trust . . . and so this would bring it all together, and it would also serve to eliminate any other potential claims on her and confuse her of who she really is because right now she's getting mixed signals on who she is.

He subsequently testified, "[R]ight now different inputs are causing stress for her, and she is confused," as "[s]he has the understanding of a fifth grader[.]"

¶13.   While John was on the witness stand, Michael was given an opportunity to question him. The following colloquy occurred:

[John:]       Her mother, at the time that the divorce was final, she told her daughter that Mr. Jones was not her father. That's been a consistent message for the past 15 years that her mother had provided, and I'm just continuing that message, which is the truth.

[Michael:]    Okay. Since her mother never changed her last name to Taylor, don't you think now would be a confusing situation for her?

[John:]       No, sir.

[Michael:]    And why do you feel that then wouldn't have been a confusing time if her mother didn't have the idea of changing her name, you have the idea of changing her name now?

[John:]       I cannot submit that the mother did not have the idea. I can submit that the mother did not want to face the financial cost of doing it, so this is directing the duty. This is best for Yasmine's long-term care and provision, and it is consistent with the plan that we have for Yasmine throughout the remainder of her life.

4

After the guardian finished testifying, the chancellor allowed Michael to testify, even though he had not formally appeared. At the end of the hearing, the chancellor stated, "I want to think about this a minute, so what I'm going to ask each party to do is write me a short memorandum, just a letter, setting out why you want me to do what you want me to do, and get that to me in five days."

¶14.   John subsequently filed a memorandum in support of his petition. He requested for Yasmine's surname be changed to Taylor because Taylor was her mother's maiden name and the surname of the family members taking care of her after her mother's death. John further explained that "[a]fter the [c]ourt determined that Michael was not Yasmine's father, Tracey consistently instructed Yasmine that Michael was not her father, and Tracey denied Michael access to Yasmine." He argued that "Yasmine dealt with the abandonment of Michael Jones in her life and the Jones last name is a constant reminder of that pain."

¶15.   Lastly, in this memorandum, John argued that "[s]ince 2009, the Taylor family has experienced over fifteen (15) legal actions with Michael Jones, and the cases continue even after the death of his former spouse. Updating Yasmine Jones' Certificate of Live Birth would potentially negate future legal attempts to use the birth certificate on terms not favorable for Yasmine[.]"

¶16.   In the end, John contended his "request for this legal name change is consistent with what Yasmine has been told consistently for over 10 years, is what Tracey would have done for Yasmine had she had the means to do so, and is what Yasmine would do if she had the

5

ability to do so."

¶17.    Michael never filed a memorandum for the chancery court to consider his position.

¶18.    Nonetheless, the chancery court entered an order denying the petition to change Yasmine's name. The order declared that "[m]aintaining a stable, healthy, caregiving environment is a key tenant of Yasmine's Family Care Plan." But "this [c]ourt cannot agree that Yasmine would pursue a change of name on her own if she were so able. Instead, the [c]ourt finds that such a change would be more instability and change and turmoil for Yasmine."

¶19.    Accordingly, the chancery court stated it saw "no real benefit to changing the legal name of the Ward but does find the potential for additional confusion and instability should the same be permitted." Consequently, "the Court finds that the change of name is not in the Ward's best interest." Aggrieved, John appeals the chancery court's decision.

## STANDARD OF REVIEW

¶20.    "In reviewing appeals taken from chancery court rulings, we apply a limited standard of review in that the factual findings of the chancery court, if supported by substantial evidence, will not be disturbed unless the chancery court abused its discretion, applied an erroneous legal standard, or its findings are manifestly wrong or clearly erroneous." *Rucker v. Miss. Dep't of Revenue*, 281 So. 3d 253, 254 (¶6) (Miss. Ct. App. 2019) (quoting *In re Smith v. Boolos*, 204 So. 3d 291, 305 (¶22) (Miss. 2016)).

## DISCUSSION

6

¶21. On appeal, Yasmine's guardian raises three assignments of error. First, he argues that the chancery court "abused its discretion by relying on clearly erroneous facts to deny Yasmine's Petition." Second, the guardian argues that Michael—who successfully sought to disestablish himself as Yasmine's father—"lacked standing to object" to the name change in the first place. Third, the guardian broadly emphasizes the proof that a name change was in Yasmine's best interest.

¶22. Michael was not formally joined as a party in the chancery court below and declined to file a memorandum with the chancery court. We note that he is not a party to this appeal and has not filed a brief.

¶23. Because we find the subject of Yasmine's best interest is dispositive, we begin our analysis there. While Yasmine is a person of adult age, because of her intellectual disabilities, she lacks the ability to take care of herself on her own. Her uncle was appointed as her guardian following the death of her mother.

¶24. "A guardian for an adult is a fiduciary." Miss. Code Ann. § 93-20-312(1) (Rev. 2020). State law has granted broad powers to a fiduciary, along with a high standard of loyalty. "A 'fiduciary' is 'required to act for the benefit of another person on all matters within the scope of their relationship,' owing 'the duties of good faith, trust, confidence, and candor.'" *Wilbourn v. Wilbourn*, 106 So. 3d 360, 371 (¶35) (Miss. Ct. App. 2012) (quoting *Fiduciary*, Black's Law Dictionary 658 (8th ed. 2004)).

¶25. "[T]raditional fiduciary relationships are found in cases of trustee and beneficiary,

partners, principal and agents, *guardian and ward*, managing directors and corporation."

*Landrum v. Livingston Holdings LLC*, 396 So. 3d 1026, 1043 (¶66) (Miss. 2024) (emphasis added) (quoting *Robley v. Blue Cross/Blue Shield of Miss.*, 935 So. 2d 990, 994 (¶10) (Miss. 2006)).  And in the end, "[t]he touchstone of the fiduciary relationship between the trustee and his beneficiaries is loyalty." *Wilbourn*, 106 So. 3d at 371 (¶35).

¶26.    Recognizing this duty of loyalty, the Legislature has determined, "Except as otherwise limited by the court, a guardian for an adult shall make decisions regarding the support, care, education, health, and welfare of the ward to the extent necessitated by the adult's limitations." Miss. Code Ann. § 93-20-312(1).  Specifically, "the guardian must make the decision the guardian reasonably believes the adult would make if the adult were able[.]" *Id*. § 93-20-312(4).  As a fallback, "If a guardian for an adult cannot make a decision under subsection (4) because the guardian does not know and cannot reasonably determine the decision the adult probably would make if able . . . the guardian must act in accordance with the best interest of the adult." *Id*. § 93-20-312(5).

¶27.    Giving deference to these duties, and recognizing that the ward may be under an incapacity, one source suggests that "[i]n guardianship proceedings, the court will generally heed the guardian's suggestions and pay much attention to his or her views as to the best course to pursue." 39 C.J.S. *Guardian & Ward* § 80 (updated Dec. 2024).

¶28.    Therefore, as her court-appointed guardian, Yasmine's uncle John was legally vested with the authority to make decisions in Yasmine's best interests.  He argues that Yasmine's

8

current last name is the surname of a man who is not her biological father and who severed any responsibilities to her over 10 years ago. Michael petitioned the chancery court for a paternity test over 18 years after Yasmine was born and 3 years after he and Yasmine's mother had divorced. Once DNA test results showed Yasmine was not his biological child, Michael initiated court proceedings to legally disestablish paternity of Yasmine and end his child support obligations.

¶29. In the time since her mother and Michael divorced, Yasmine has had little, if any, contact with Michael. As the guardian argues on appeal, "since Michael established he was not [her] biological father, Yasmine was consistently told by her mother and grandmother that [he] was not her father." And the undisputed record shows there is no father-daughter or close familial relationship between Yasmine and Michael, nor has there been for over a decade.

¶30. We find instructive precedent from our Supreme Court in one of the only name-change cases reported, where the Court found it was improper to change the name of a minor when their parent continued to be actively engaged in the minor's life. *Marshall v. Marshall*, 230 Miss. 719, 729, 93 So. 2d 822, 827 (1957). The case involved an 11-year-old boy whose mother sought to change the child's last name from that of his biological father to the last name of her new husband. *Id*. at 823. Despite his father's protests, the Hinds County Chancery Court granted the name change request for the child. *Id*.

¶31. On appeal, our Supreme Court was not persuaded that the name change was in the

9

child's best interest, as "[o]rdinarily a change of the name of a minor child of divorced parents should not be granted where it might contribute to the estrangement of the child from its father who has shown a desire to preserve the parental relationship[.]" *Id*. at 825. "[B]ut such an application has been granted where the father is shown to have been indiffer[ent] to the son's material welfare over a period of years and he is, in reality, a stranger and unknown to him." *Id*.

¶32. The father in *Marshall* made an effort to preserve the parent-child relationship far better than most. The Court wrote that the 11-year-old son "sees his father about twice a year" when "the father mak[es] trips back [from Michigan] to Mississippi to see and visit with his son," "writes to the child about once a week," "occasionally calls him up and talks to him over long distance telephone," and "sends him presents and does all in his power to keep as closely in contact with him as he can." *Id*. at 824. The Court found this was evidence of "constantly maintain[ing] parental association," while noting these "contributions have been relatively meager[.]" *Id*. at 827.

¶33. In reversing the decree changing the name, the Supreme Court determined:

> Where a parent has abandoned his children or fails to visit them for protracted periods of time or contribute to their support, where continued use of a name may bring shame and disgrace, where the physical welfare of the child may be adversely affected by a denial of the application or substantial property rights are involved, the Court would have no difficulty in permitting the change of name in the best interest of the infant.

*Id*.

¶34. Because it is undisputed in the record that Yasmine functions at the level of a young

child, at a fourth-grade or fifth-grade level, she is situated similarly to the 11-year-old in *Marshall*. But unlike the devoted father in that case, here, there was absolutely no evidence of a "father who has shown a desire to preserve the parental relationship." *Id*. at 825. In sharp contrast to the father in *Marshall*, the proof in this case shows that Michael took legal action to *nullify* his title as Yasmine's father, seeking a paternity test because he wanted to halt child support payments.

¶35. And unlike the father in *Marshall*, there was no proof at trial that Michael conducted himself as a devoted father figure by regularly visiting Yasmine, contributing to her support, or acting in any other way "show[ing] a desire to preserve the parental relationship" in the years since he sought to be disestablished as her father. *Id*. Instead, after the chancery court granted his request to stop paying child support, Michael became, "in reality, a stranger" to Yasmine. *Id*.

¶36. Therefore, because Michael was not her biological father and there was an absence of proof that he maintained a parental association with her, there was no reason rooted in the law for Yasmine to maintain Michael's last name. Since there is no biological connection to Michael Jones, and any previous ties between them have been severed, it is reasonable to believe that an adult in Yasmine's situation would desire to change her last name and not use the surname of a man who disavowed being her father and is simply her mother's ex-husband. In contrast, the guardian's testimony was that *based on his experience caring for Yasmine*, he believed she would decide to change her name if she were able. The guardian

also testified that it was his understanding that Tracey wanted to petition to change Yasmine's last name, but she did not have the financial resources to do so.

¶37.    Furthermore, John noted that since 2009, Michael has initiated over 15 legal actions against Tracey and the Taylor family arising out of his connection to Yasmine through her birth certificate and their shared last name. He contends that changing Yasmine's last name would potentially negate future legal attempts that could harm her.

¶38.    Taking all of this evidence together, we find it is reasonable to believe Yasmine would make the request herself if she were able, and changing her name to Taylor would be in her best interest.  As in *Marshall*, we have a scarcity of precedent on this subject. But as one authority holds, "The court may not substitute its judgment for that of a guardian unless it plainly appears that a case has been made justifying its interference with the discretion of the guardian as to what is in the best interests of the ward." 39 C.J.S. § 8 *Guardian & Ward*. The chancery court's order here was devoid of findings justifying its rejection of the guardian's request. In contrast, as set out amply above, there was a wealth of evidence that the name change was in her best interests.

¶39.    The dissent is correct that there are instances in which the chancellor acts as a "superior guardian." One time-honored circumstance is when a ward must be "rescue[d] . . . from faithless guardians[.]" *In re Conservatorship of Mathews*, 633 So. 2d 1038, 1040 (Miss. 1994). Yet the same sentence in *Mathews* is clear that the chancellor should safeguard those in need from "designing strangers, and even from unnatural parents[.]" *Id.*

12

¶40. That is the unique situation in this case. Although a trial court may be called upon as a safeguard, that does not mean the chancellor is free to ignore the clearly expressed intention of a *faithful* guardian—who, in this matter, was lawfully appointed to fill the shoes of the child's deceased mother and is oath-bound to uphold the "best interests of the ward."

¶41. Although the chancery court allowed the disestablished father to question whether the name change was in Yasmine's best interest, the record is clear that she did not testify, and the chancellor did not question her on the stand or in chambers. Therefore, given that the chancellor was tasked with deciding what was in Yasmine's best interest based on the evidence actually presented and made a part of the record—between a guardian acting to serve her best interests and a former parent who took legal action to sever his paternal connection with her—we cannot affirm based on the record in this case.

¶42. In the end, Michael fit the category of the parent described in *Marshall*—one who "abandoned his children or fails to visit them for protracted periods of time or contribute to their support," and just as in that case, any court should "have no difficulty in permitting the change of name in the best interest of the infant." 93 So. 2d at 827. Accordingly, and under the unique facts of this case, we find that it was an abuse of discretion for the chancery court to depart from the guardian's request to change Yasmine's last name.

¶43. We reverse the chancery court's ruling and render a judgment granting the petition filed by John on Yasmine's behalf to legally change her surname from Jones to Taylor. We further remand this case to the chancery court with instructions to enter an order consistent

13

with this Court's opinion.[1]

¶44.    **REVERSED, RENDERED, AND REMANDED.**

    **BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, EMFINGER, WEDDLE AND ST. PÉ, JJ., CONCUR.   WILSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY LAWRENCE, J.**

    **WILSON, P.J., DISSENTING:**

¶45.    Although the chancellor previously appointed John Taylor to act as Yasmine's guardian, the Mississippi Supreme Court has long held that the chancellor remains the "*superior* guardian" of an adult ward such as Yasmine. *In re Conservatorship of Mathews*, 633 So. 2d 1038, 1040 (Miss. 1994) (emphasis added).  It is the chancellor's "inescapable duty . . . to act with constant care and solicitude towards the preservation and protection of [the ward's] rights." *Id.* (emphasis omitted) (quoting *Union Chevrolet Co. v. Arrington*, 162 Miss. 816, 826, 138 So. 593, 595 (1932)).  The chancellor "will and must take all necessary steps to conserve and protect the best interest of the[] ward[]." *Id.*

¶46.    Here, the chancellor "cautiously considered" Taylor's petition to change Yasmine's name but found that it was "not in [Yasmine's] best interest."  The chancellor noted that Yasmine was presumed to be Jones's biological daughter from her birth in 1993 until 2012.  In addition, Jones and Yasmine's mother, Tracey, had one son, who is Yasmine's half-brother.  Although Jones and Tracey divorced in 2009, Jones exercised visitation with

---

    [1] To the extent John makes a plea to modify Yasmine's birth certificate, such request is not properly before this Court. *See* Miss. Code Ann. § 41-57-23 (Rev. 2023).

14

Yasmine and paid child support after the divorce. Yasmine and her half-brother also lived with Jones's mother for a time after the divorce because the Department of Human Services (DHS) had removed them from Tracey's home.[2] Around 2012, a paternity test showed that Jones was not Yasmine's biological father.[3] Based on the paternity test, the chancery court terminated Jones's visitation with Yasmine as well as Jones's obligation to pay child support for her.[4] Jones testified that Yasmine was at his home in Alabama when the court terminated his visitation and ordered him to return Yasmine to Tracey. Jones testified that he desired to maintain a relationship and visitation with Yasmine even after he learned that she was not his biological daughter, but Tracey prohibited him from doing so. Although Jones was no longer required to pay child support, he and his wife continued to provide insurance for Yasmine until 2017. Moreover, in Yasmine's conservatorship case, Jones and his wife testified that they wanted Yasmine to live with them in their home. There is no evidence that Jones had any ulterior motive for doing so. And although Taylor was appointed to be Yasmine's conservator, the chancellor ordered that Jones "shall be permitted to visit with

---

[2] Jones testified that he was working out of state at the time, and the children were placed with his mother so that they would not have to change schools.

[3] Taylor testified that the identity of Yasmine's biological father was "a secret [Tracey] took to her grave."

[4] The paternity issue apparently arose after DHS commenced contempt proceedings against Jones because he had fallen behind on child support payments. The record in this case contains only a few documents from the contempt proceeding. The pleadings and other evidence indicate that Jones stopped paying child support because Yasmine and her half-brother were living with Jones's mother. It is unclear whether Jones sought to terminate child support before or after Tracey sought to terminate his visitation with Yasmine.

15

[Yasmine] at her apartment during reasonable hours."

¶47. The majority opinion relies heavily on the fact that Jones "took legal action to *nullify* his title as Yasmine's father, seeking a paternity test because he wanted to halt child support payments." *Ante* at ¶34. The majority writes that Jones did not "maintain[] a parental association with [Yasmine]" or "conduct[] himself as a devoted father figure by regularly visiting Yasmine, contributing to her support," et cetera. *Ante* at ¶¶35-36. However, it is unclear exactly when or why a paternity test was requested. It is also unclear whether Jones sought to terminate child support before or after Tracey sought to terminate his visitation. In any event, Jones testified that he tried to maintain a relationship with Yasmine, but Tracey prohibited it. Moreover, after Tracey died, Jones and his wife wanted Yasmine to live with them in their home. Thus, while Jones did seek to terminate his child support obligation after he learned that Yasmine was not his biological daughter,[5] there clearly was a father-daughter relationship between them for many years, and there is evidence that Jones desired and attempted to maintain his relationship with Yasmine.

¶48. The majority opinion also states: "Michael has initiated over 15 legal actions against Tracey and the Taylor family arising out of his connection to Yasmine through her birth certificate and their shared last name. [Taylor] contends that changing Yasmine's last name would potentially negate future legal attempts that could harm her." *Ante* at ¶37. However,

---

[5] Our Supreme Court has stated that it would be a "manifest injustice" to require a parent "to continue making child support payments for a child which unquestionably is not his." *M.A.S. v. Miss. Dep't of Hum. Servs.*, 842 So. 2d 527, 531 (¶19) (Miss. 2003).

16

this assertion is merely a line from Taylor's post-hearing memorandum brief. There is no *evidence* in the record to support it. Taylor's post-hearing brief did not identify, describe, or provide any evidence about the alleged "15 legal actions." Nor did Taylor articulate how changing Yasmine's surname would provide any legal benefit. The chancellor certainly was not bound to accept an unsupported and unexplained assertion in a post-hearing brief.

¶49. The chancellor rejected Taylor's claim "that Yasmine would pursue a name change on her own if she were so able." The chancellor also found that there was "no real benefit to changing [Yasmine's] legal name." Rather, the chancellor found that changing Yasmine's name could cause "more instability and change and turmoil for [her]." Accordingly, the chancellor found that changing Yasmine's name was "not in [her] best interest."

¶50. The chancellor's findings are not unreasonable. Yasmine is now a thirty-one-year-old adult with special needs. She has had the same name her entire life. Indeed, for the decade after the paternity test showed that Jones was not her biological father, Yasmine's mother took no action to change Yasmine's name. Taylor's name-change petition would not even give Yasmine her late mother's surname, which was Freeman in the years prior to her death. Rather, the petition would change the name Yasmine has lived with for thirty-one years to her late mother's former (maiden) name. The chancellor found that such a change would provide Yasmine no real benefit and could potentially confuse her. As Yasmine's "superior guardian," the chancellor had the power and duty to act in Yasmine's best interest regardless of what her uncle wanted. *Mathews*, 633 So. 2d at 1040. I cannot say that the chancellor

17

clearly erred or abused his discretion.  Accordingly, I respectfully dissent.

**LAWRENCE, J., JOINS THIS OPINION.**